PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 08-4564

MAURICIO VALDIVIEZO-GALDAMEZ,

Petitioner

v.

ATTORNEY GENERAL OF
THE UNITED STATES,

Respondent

Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No.  A097-447-286)

**Argued: February 3, 2010**

Before: McKEE, *Chief Judge*, HARDIMAN, *Circuit Judge*,
and
DAVIS, *District Judge**

---

*Hon. Legrome D. Davis, United States District Judge
for the Eastern District of Pennsylvania, sitting by

(Opinion filed: November 8, 2011)

MARTIN DUFFEY, ESQ. (Argued)
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
AYODELE GANSALLO, ESQ.
HIAS & Council Migration Services of
Philadelphia
2100 Arch Street
Philadelphia, PA 19103
*Attorneys for Petitioner*

H. ELIZABETH DALLAM, ESQ.
Senior Protection Officer
United Nations High Commissioner
for Refugees
1775 K Street NW, Suite 300
Washington, D.C.  20006
*As Amicus Curiae for the United Nations
High Commissioner for Refugees, in support
of Petitioner*

TONY WEST, ESQ.
Assistant Attorney General
Civil Division
LINDA S. WERNERY, ESQ.

designation.

Assistant Director
MARGARET PERRY, ESQ.
Senior Litigation Counsel
THEODORE C. HIRT, ESQ. (Argued)
Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
*Attorneys for Respondent*

OPINION

McKEE, *Chief Judge.*

Mauricio Valdiviezo-Galdamez petitions for review of a decision of the Board of Immigration Appeals dismissing his appeal from an Immigration Judge's order denying his applications for asylum, withholding of removal and relief under Article III of the Convention Against Torture. For the reasons that follow, we will grant the petition for review on the asylum and withholding of removal applications and remand for further proceedings; we will deny the petition for review on the claim for relief under the Convention Against Torture.

## I. FACTUAL BACKGROUND[1]

---

[1]The facts are taken from our opinion on Valdiviezo-
(continued...)

3

Mauricio Edgardo Valdiviezo-Galdamez was born in May 1984, and is a native and citizen of Honduras. He came to the United States in October 2004 without being admitted or paroled after inspection by an immigration officer. Removal proceedings were initiated against him in January 2005. During those proceedings, Valdiviezo-Galdamez admitted removability, but submitted an application for asylum, withholding of removal, and relief under Article III of the Convention Against Torture ("CAT"), as noted above.

At the ensuing removal hearing before an Immigration Judge, Valdiviezo-Galdamez testified that he fled Honduras because members of a gang called "Mara Salvatrucha," a/k/a "MS-13," had threatened to kill him if he did not join their gang. Valdiviezo-Galdamez testified that the gang engages in drug trafficking and, on occasion, commits murder. According to Valdiviezo-Galdamez, the gang members began threatening him in March 2003, when he was living in the city of San Pedro Sula in Honduras. On one occasion six men approached Valdiviezo-Galdamez and robbed him as he was leaving work. They told him that he would have to join their gang to get his money and jewelry back. When he refused, the men hit him and told him that he better think about their "proposal." Valdiviezo-Galdamez knew that the men were members of Mara Salvatrucha because they had tattoos that were characteristic of

---

[1](...continued)
Galdamez's prior petition for review. *Valdiviezo-Galdamez v. Attorney General* ("*Valdiviezo-Galdamez I*"), 502 F.3d 285, 286-287 (3d Cir. 2007).

4

gang membership.

Valdiviezo-Galdamez waited three days before reporting the incident to the police because he was afraid to leave his house. After this incident, he moved to live with his mother in Santa Rosa de Cupon because he was afraid the gang would come after him if he remained in San Pedro Sula. He did not leave his mother's house during the three months he stayed in Santa Rosa. He returned to San Pedro Sula in June 2003 because he received a job offer. He testified that he did not think that he could find work in Santa Rosa because the village is largely agricultural and most people are farmers. In addition, he was afraid to stay in Santa Rosa because some of his former classmates who lived there were gang members and he feared that they would discover his presence.

After Valdiviezo-Galdamez returned to San Pedro Sula, he moved to a different colony within the city in an attempt to avoid members of Mara Salvatrucha. However, gang members soon spotted him and renewed their threats. They shot at him, and threw rocks and spears at him about two-to-three times a week. When he ran, they would shout after him: "Don't run. Don't be afraid. Sooner or later you will join us." He was able to identify some of the men, either by the gang nicknames inscribed in their tattoos or because they addressed one another by those nicknames. Valdiviezo-Galdamez filed five separate police reports about these incidents, but claimed he received no response from the police.

Valdiviezo-Galdamez testified that he was in a two car caravan on his way to visit his sister's husband in Guatemala,

in September, 2004, when he and his fellow passengers in one of the cars were kidnapped by members of Mara Salvatrucha after crossing the border into Guatemala. They were taken into the mountains where the kidnappers asked Valdiviezo-Galdamez what he was doing in Guatemala. He told them that he was only traveling, but his abductors thought he was trying to escape recruitment into their gang. Valdiviezo-Galdamez testified that they told him they were no longer offering him the option of joining their gang, and had decided to kill him instead. They then tied Valdiviezo-Galdamez up and beat him for five hours.

He was eventually freed by the Guatemalan police who had been alerted by family members who were traveling behind Valdiviezo-Galdamez and had not been spotted by the attackers. Valdiviezo-Galdamez filed a complaint with the Guatemalan police, but they simply said that it was not their problem since he wasn't from Guatemala. Valdiviezo-Galdamez remained in Guatemala briefly with his sister's husband, and then decided to come to the United States to escape the gang. He testified that he believes that the gang members will kill him and attack his family if he returns to Honduras and continues to resist gang recruitment.

In his asylum application, Valdiviezo-Galdamez alleged that he had been persecuted in Honduras on account of his membership in a particular social group, that he had suffered persecution on account of his political opinion and that he had a well-founded fear that such persecution would continue if he were returned to Honduras.

## II. PROCEDURAL HISTORY

On June 15, 2005, after a hearing, the Immigration Judge denied Valdiviezo-Galdamez's applications for relief although he found no reason to disbelieve Valdiviezo-Galdamez's testimony. The IJ suggested three failures of proof. The IJ concluded that Valdiviezo-Galdamez had not established that the government refused to protect him from the attacks by the Mara Salvatrucha members and that the refusal was on account of one of the five grounds enumerated in the Immigration and Nationality Act ("INA"), i.e., his race, religion, nationality, membership in a particular social group or political opinion. Second, the IJ found that Valdiviezo-Galdamez failed to establish that he had been injured on account of his race, religion, nationality, membership in a particular social group or political opinion. Third, the IJ noted that Valdiviezo-Galdamez had lived in Santa Rosa without problems and faulted him for failing to establish that the danger of persecution at the hands of the gang members was country-wide.[2] The IJ also found that Valdiviezo-Galdamez presented no evidence that he would be tortured if returned to Honduras.

Valdiviezo-Galdamez appealed that ruling to the Board

---

[2] *See* 8 C.F.R. § 1208.13(b)(2)(ii) ("An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality ... if under all the circumstances it would be reasonable to expect the applicant to do so.").

of Immigration Appeals. In his brief to the BIA, he argued, *inter alia*, that he belonged to the "particular social group" of "Honduran youth who have been actively recruited by gangs but have refused to join because they oppose the gangs." On February 27, 2006, the BIA rejected the argument and summarily affirmed the IJ's decision.

Valdiviezo-Galdamez then filed his first petition for review with this court. We granted the petition, vacated the BIA's decision and remanded for further proceedings. *Valdiviezo-Galdamez v. Attorney General* ("*Valdiviezo-Galdamez I*"), 502 F.3d 285 (3d Cir. 2007). We held, in pertinent part, that substantial evidence did not support the IJ's determination that Valdiviezo-Galdamez had failed to establish that the harm he suffered in Honduras was on account of his membership in the group consisting of young men who had been recruited by gangs and had refused to join. *Id*. at 290. We remanded to the BIA for it to address the threshold question of whether "young men who have been actively recruited by gangs and who have refused to join the gangs" is a "particular social group" within the meaning of the INA - an issue that neither the IJ nor the BIA had decided – and which we declined to decide in the first instance. *Id*. We also directed the BIA to address whether the injures that Valdiviezo-Galdamez suffered rose to the level of persecution. *Id*. at 291. In addition, we held that the IJ erred in his analysis of whether Valdiviezo-Galdamez could safely relocate within Honduras. *Id*. at 291-92. Finally, we held that the IJ erred in denying the application for relief under the CAT because the IJ ignored relevant evidence and remanded for consideration of the relevant evidence in light of our decision in *Silva-Rengifo v. Attorney General*, 473 F.3d 58

(3d Cir. 2007). *Id*. at 292-93. There, we addressed the standard for proving government acquiescence to torture.

On remand, the BIA again rejected Valdiviezo-Galdamez's claims.[3] The BIA concluded that Valdiviezo-Galdamez failed to show that he had experienced past persecution or had a well-founded fear of future persecution "on account of" a classification that is protected under the INA.

_____

[3]Valdiviezo-Galdamez was represented by Nicole Simon at his first hearing before the IJ, as well as in his first appeal to the BIA. He was also represented by counsel, Martin P. Duffey and Ayodele Gansallo, on his first petition for review with us. After we remanded, the BIA sent a notice of remand to Valdiviezo-Galdamez and Simon advising them that the case had been put on the docket for adjudication and that if Valdiviezo-Galdamez wished to be represented by counsel, that representative must file a new entry of appearance unless that one had already been filed. However, no entry of appearance was filed. Only the government filed a brief after the remand.

The BIA's October 22, 2008 decision following remand stated that he had appeared *pro se*. However, prior to the BIA's decision, Gansallo, who had not entered an appearance with the BIA after remand, and did not seek an opportunity to file a brief, sent a September 23, 2008, letter to the BIA advising the BIA that it was required to consider the social group issues on remand. The BIA did send a courtesy copy of its October 22, 2008 decision to Gansallo.

App. 10-11. The BIA also noted that it had decided the "closely analogous" case of *Matter of S-E-G.*, 24 I. & N. Dec. 579 (BIA 2008), after we remanded Valdiviezo-Galdamez's petition for review. App. 11. In *Matter of S-E-G*, the BIA held that Salvadoran youth who were subjected to recruitment efforts by the Mara Salvatrucha, and who resisted gang membership "based on their own personal, moral and religious opposition to the gang's values and activities," did not constitute a "particular social group." *Id.* at 579. In again rejecting Valdiviezo-Galdamez's claim, the BIA relied on *Matter of S-E-G* and its companion case, *Matter of E-A-G*, 24 I. & N. Dec. 591 (BIA 2008). The BIA concluded that it had previously held that a "particular social group" is a group whose members share a common, immutable characteristic that members either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences. App. 11. In *Matter of E-A-G*, the Board concluded that it would give "greater specificity" to that test by adding the concepts of "particularity" and "social visibility." *Id.*

Here, as in *Matter of S-E-G*, the BIA reasoned that the proposed "particular social group" of "Honduran youth who have been actively recruited by gangs but have refused to join because they oppose gangs" lacked "particularity" because it was a "potentially large and diffuse segment of society" and "too broad and inchoate" to qualify for relief under the INA. App. 11. The BIA believed that the proposed social group lacked "social visibility" as required under *Matter of E-A-G* because persons who resist gangs were not shown to be socially visible or a recognizable group or segment of Honduran society, and the risk of harm Valdiviezo-Galdamez feared was actually

10

an individualized gang reaction to his specific behavior.[4] App. 11.

The BIA also concluded that Valdiviezo-Galdamez's claim of persecution on account of political opinion was foreclosed by *INS v. Elias-Zacarias*, 502 U.S. 478 (1992). There, the Supreme Court held that a guerrilla organization's attempt to conscript a Guatemalan native into its military did not necessarily constitute persecution on account of political opinion. However, the Court did not there address the issue of whether the alien could qualify for asylum as a member of a particular social group because he argued that his opposition was a "political opinion" that qualified for relief. The Court rejected that proposition because the alien did not establish that he would be prosecuted because of that political opinion and not "because of his refusal to fight." *Id*. at 483.

In rejecting Valdiviezo-Galdamez's appeal, the BIA reasoned that although he claimed to fear gang retaliation, he "failed to show a political motive in resisting gang recruitment or a well-founded fear of future persecution on account of his political opinion." App. 12. The BIA noted that there was "no

---

[4]Because the BIA found that Honduran youth who have been recruited by gangs but have refused to join because they oppose gangs was not a "particular social group" within the meaning of the INA, it did not have to decide whether the government was unable or unwilling to protect Valdiviezo-Galdamez or whether Valdiviezo-Galdamez could have safely relocated within Honduras.

11

evidence" that Valdiviezo-Galdamez was "politically active" or made any "anti-gang political statements." *Id*. According to the BIA, Valdiviezo-Galdamez did not provide any evidence that the gang "imputed, or would impute to him, an anti-gang political opinion, or would be interested in him for any reason other than to simply increas[e] their ranks." *Id*.

The BIA also denied Valdiviezo-Galdamez's CAT claim because he failed to show past conduct rising to the level of torture. In addition, even assuming *arguendo*, that he had established it was "more likely than not" that he would be tortured by the gang, the Board reasoned that he had not established that the torture would be inflicted with the acquiescence of a public official. *Id*. at 13.

This petition for review followed.

## III. STANDARD OF REVIEW

Our review of questions of law is *de novo*. *Kamara v. Attorney General*, 420 F.3d 202, 210-11 (3d Cir. 2005). We review the BIA's statutory interpretation of the Immigration and Nationality Act under the deferential standard set forth in *Chevron v. Natural Resources Defense Counsel*, 467 U.S. 837 (1984). *Lukwago v. Ashcroft*, 329 F.3d 157, 162 (3d Cir. 2003). Under that analytical framework, if the statute is silent or ambiguous about an issue, we must determine if the agency's interpretation is based on a permissible construction of the statute. *Fatin v. INS*, 12 F.3d 1233, 1239 (3d Cir. 1993). We review the Board's findings of fact under the "substantial evidence" standard, *Tarrawally v. Ashcroft*, 338 F.3d 180, 186

12

(3d Cir. 2003).  We can only reverse the Board's decision if "any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B).  *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

## IV. GENERAL LEGAL PRINCIPLES
### A. Asylum and withholding of removal.

Section 208 of the INA gives the Attorney General discretion to grant asylum to removable aliens. 8 U.S.C. § 1158(a).  However, that relief can only be granted if the applicant is a "refugee." *Id*.  "[R]efugee" is defined as:

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside of any country in which such person last habitually resided, and who is unable or unwilling to avail himself or herself of the protection of that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).  Accordingly, an alien's ability to establish that s/he is entitled to relief as a refugee turns on whether s/he can establish persecution "on account of" one of the five statutory grounds. *INS v. Elias-Zacarias*, 502 U.S. 478

13

(1992).

An applicant who establishes past persecution is "entitled to a presumption that his[/her] life or freedom will be threatened if [s/]he returns." *Gabuniya v. Attorney General*, 463 F.3d 316, 321 (3d Cir. 2006); *see* 8 C.F.R. § 208.16(b)(1). Where an applicant is unable to demonstrate that s/he has been the victim of past persecution, the applicant nonetheless becomes eligible for asylum upon demonstrating a well-founded fear of future persecution if returned to his/her native country. *See Abdulrahman v. Ashcroft*, 330 F.3d 587, 592 (3d Cir. 2003). The well-found fear of persecution standard involves both a subjectively genuine fear of persecution and an objectively reasonable possibility of persecution. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987). The subjective prong requires a showing that the fear is genuine. *Mitey v. INS*, 67 F.3d 1325, 1331 (7th Cir. 1995). Determining whether the fear of persecution is objectively reasonable requires ascertaining whether a reasonable person in the alien's circumstances would fear persecution if returned to a given country. *Chang v. INS*, 119 F.3d 1055, 1065 (3d Cir. 1997). If

If the persecution was not conducted directly by the government or its agents, the petitioner must also establish that it was conducted "by forces the government is unable or unwilling to control." *Kibinda v. Attorney General*., 477 F.3d 113, 119 (3d Cir. 2007).

Withholding of removal is mandatory if "the Attorney General determines that [the] alien's life or freedom would be threatened" on account of a protected ground. 8 U.S.C. §

14

1253(h)(1) (re-codified, as amended, at 8 U.S.C. § 1231(b)(3)). To qualify for withholding of removal, an alien must establish a "clear probability of persecution," i.e., that it is more likely than not, that s/he would suffer persecution upon returning home. *See INS v. Stevic*, 467 U.S. 407, 429-30 (1984). Since this standard is more demanding than that governing eligibility for asylum, an alien who fails to qualify for asylum is necessarily ineligible foI wir withholding of removal. *Zhang v. Slattery*, 55 F.3d 732, 738 (2d Cir. 1995).

## B. Relief under the CAT.

"An applicant for relief on the merits under [Article III] of the Convention Against Torture bears the burden of establishing 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Sevoian v. Ashcroft*, 290 F.3d 166, 174-175 (3d Cir. 2002) (quoting 8 C.F.R. § 208.16(c)(2)). "The United States Senate specified this standard, as well as many of the other standards that govern relief under the Convention, in several 'understandings' that it imposed on the United States' ratification of the Convention Against Torture." *Id.* at 175 (citations omitted). "The standard for relief has no subjective component, but instead requires the alien to establish, by objective evidence, that [s/]he is entitled to relief." *Id.* (citation and internal quotations omitted). The alien's testimony, if credible, may be sufficient to sustain the burden of proof without corroboration. *Mansour v. INS*, 230 F.3d 902, 907 (7th Cir. 2000) (citing 8 C.F.R. § 208.16(c)(2)). If an alien meets his or her burden of proof, withholding of removal or deferring of removal is mandatory. INA § 241(b)(3); 8 C.F.R. §§ 208.16 -

15

208.18.

> Under the implementing regulations for the Convention:
>> Torture is defined as an act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).

"[T]he regulations clearly state that there is no acquiescence to torture unless the relevant officials know about the torture *before* it occurs." *Sevoian*, 290 F.3d at 176 (citing 8 C.F.R. § 208.18(a)(7)) (emphasis in original). In *Silva-Rengifo v. Attorney General*, 473 F.3d 58, 70 (3d Cir. 2007), we held that "acquiescence to torture [as used in the regulation]

16

requires only that government officials remain willfully blind to torturous conduct and breach their legal responsibility to prevent it." The regulations also provide:

> (3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:
> (i) Evidence of past torture inflicted upon the applicant;
> (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
> (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and
> (iv) Other relevant information regarding conditions in the country of removal.

8 C.F.R. § 208.16(c)(3). "[C]ountry conditions alone can play a decisive role [in determining if relief is warranted]. . . [and] the law does not require that the prospective risk of torture be

17

on account of certain protected grounds."[5]  *Kamalthas v. INS*, 251 F.3d 1279, 1280 (9th Cir. 2001).

"Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel and inhuman treatment or punishment that do not amount to torture." 8 C.F.R. § 1208.18(a)(2).  Therefore, "even cruel and inhuman behavior by government officials may not implicate the torture regulations." *Sevoian*, 290 F.3d at 175.  "[T]orture covers intentional governmental acts, not negligent acts or acts by private individuals not acting on behalf of the government." *In re J-E-*, 23 I. & N. Dec. 291, 299 (BIA 2002).  The BIA has also held that "[v]iolence committed by individuals over whom the government has no reasonable control does not implicate" relief under the CAT.  *In re Y-L-, A-G-, R-S-R-*, 23 I. & N. Dec. 270, 280 (BIA 2002).  Similarly:

> the existence of a consistent pattern of gross, flagrant, or mass violations of human rights in a particular country does not, as such, constitute a sufficient ground for determining that a particular person would be in danger of being subjected to torture upon his or her return to that country. Specific grounds must exist that indicate that the individual would be personally at risk

.

---

[5]Because the risk of torture does not need to be on account of certain protected grounds, "the inability to state a cognizable asylum claim does not necessarily preclude relief under the [CAT]." *Kamalthas*, 251 F.3d at 1280.

*In re S-V-*, 22 I. & N. Dec. 1306, 1313 (BIA 2000).

## V. DISCUSSION

Although we will address each of the arguments Valdiviezo-Galdamez makes in  support of his petition for review, his principal claim is clearly that the BIA erred by requiring "particularity" and "social visibility" to establish that he is a member of a particular social group. He argues that is contrary to, and inconsistent with, the text of the INA.

Before we can address the merits of this claim, we must first address the government's claim that we have no jurisdiction to consider Valdiviezo-Galdamez's challenge to the BIA's requirements that a group must have  "particularity" and "social visibility" to constitute a  "particular social group."  The government argues that we cannot reach the merits because Valdiviezo-Galdamez failed to exhaust his administrative remedies with respect to that issue.

The government notes that in May 2008, the BIA notified Valdiviezo-Galdamez of its briefing schedule on remand, but Valdiviezo-Galdamez did not file a brief.   The government also notes that Ayodele Gansallo, who had represented Valdiviezo-Galdamez on his prior petition for review, did send the BIA a letter in September 2008 advising the Board that it was required to consider the social group issues on remand. *See* n.3, *supra.*  However, Gansallo neither entered an appearance nor filed a brief addressing the issues raised by the Board's discussion of "particular social group" in *Matter of S-E-G*, *supra*, and  *Matter of E-A-G*, *supra.*  As we

19

have explained, in those cases, the Board rejected claims for asylum on account of being a member of a particular social group based on the aliens' opposition to gang recruitment. Thus, the government believes that Valdiviezo-Galdamez "failed to present his challenges to the [BIA's] interpretation of 'particular social group' articulated in its 2006-2008 decisions."[6] Government's Br. at 18. Accordingly, the government contends that we have no jurisdiction because Valdiviezo-Galdamez failed to exhaust his administrative remedies because he did not challenge the BIA's "particular social group" analysis in his petition for review.

Prior to raising an issue for judicial review, a petitioner must exhaust all administrative remedies available as of right regarding that issue. 8 U.S.C. § 1252(d)(1); *Sandie v. Att'y Gen.*, 562 F.3d 246, 250 n.1 (3d Cir. 2009). The government is correct in arguing that this is a jurisdictional requirement. *See Hoxha v. Holder*, 559 F.3d 157, 159 n.3 (3d Cir. 2009) ("[I]ssue exhaustion as required by § 1252(d)(1) is a jurisdictional rule."). Requiring petitioners to raise all issues before the BIA permits the agency "to resolve a controversy or correct its own errors before judicial intervention." *Bonhometre v. Gonzales*, 414 F.3d 442, 447 (3d Cir. 2005).

_____

[6]In *Matter of S-E-G*, the BIA noted that in 2006 through 2008, it had rendered decisions that "membership in a purported social group requires that the group have particular and well-defined boundaries, and that it possesses a recognized level of social visibility." 24 I. & N. at 582.

20

It is undisputed that Valdiviezo-Galdamez did not address the BIA's "particular social group" analysis, i.e., its requirements for "particularity" and "social visibility," following our remand to the BIA. However, that does not automatically deprive us of jurisdiction now. In *Lin v. Attorney General*, 543 F.3d 114 (3d Cir. 2008), we held that "the BIA's consideration of an issue is sufficient to provide us with jurisdiction over that issue" even if the petitioner fails to raise the issue before the BIA. 543 F.3d at 123 n.7. Here, the BIA held that the "particular social group" proposed by Valdiviezo-Galdamez did not qualify for asylum consideration because it lacked "particularty" and "social visibility." Since the BIA raised the issue *sua sponte*, we have jurisdiction over Valdiviezo-Galdamez's challenge to the BIA's requiring "particularity" and "social visibility" as a condition precedent to qualifying for relief from removal. Accordingly, we will address the merits of his claim that he is a member of a particular social group for purposes of establishing that he is a "refugee."

### 1.  The BIA erred in denying the application for asylum.

Valdiviezo-Galdamez makes three arguments in support of his contention that the BIA erred in denying his application for asylum. We consider each separately.

### A.  The BIA erred by applying a new standard to determine membership in a "particular social group."

To understand this argument, some background

21

information is necessary.  As noted above, pursuant to INA §
208, an alien must establish not only that s/he has been
persecuted in the country of origin, but that such persecution
was "on account of" one of the grounds specified in that statute.
As also noted above, Valdiviezo-Galdamez is arguing that he is
entitled to relief based on persecution on account of his
membership in "a particular social group."

> In *Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993), we wrote:
>> Both courts and commentators have
>> struggled to define "particular
>> social group."  Read in its broadest
>> literal sense, the phrase is almost
>> completely open-ended.  Virtually
>> any set including more than one
>> person could be described as a
>> "particular social group." Thus, the
>> statutory language standing alone is
>> not very instructive.

*Id*. at 1238 (footnotes omitted).  The concept is even more
elusive because there is no clear evidence of legislative intent.
*Id*. at 1239.  We explained in *Fatin*, that the "phrase 'particular
social group' was first placed in the INA when Congress
enacted the Refugee Act of 1980," but the legislative history of
the Refugee Act "does not reveal what, if any, specific meaning
the members of Congress attached to the phrase. . .[,]" other
than to make it clear that Congress intended "to bring United
States refugee law into conformance with the 1967 United
Nations Protocol Relating to the Status of Refugees . . . to which
the United States acceded in 1968."  *Id*. (footnote and citations

22

omitted).  Thus, in *Fatin*, we reasoned that it was "appropriate to consider what the phrase 'particular social group' was understood to mean in the Protocol."  *Id*.

> Article I of the Protocol generally adopted the definition of a "refugee" contained in Article I of the United Nations Convention Relating to the Status of Refugees. This latter provision defined a "refugee" using terms – i.e., "race, religion, nationality, membership in a particular social group or political opinion" – virtually identical to those now incorporated in the INA. When the Conference of Plenipotentiaries was considering the Convention in 1951, the phrase "membership in a particular social group" was added to this definition as an "afterthought."  The Swedish representative proposed this language, explaining only that it was needed because "experience has shown that certain refugees had been persecuted because they belonged to particular social groups," and the proposal was adopted.  Thus, neither the legislative history of the relevant United States statutes nor the

23

negotiating history of the pertinent international agreements sheds much light on the meaning of the phrase "particular social group."

*Id*. (citations omitted).

From 1985 until 2006, the BIA issued a number of decisions dealing with the meaning of "particular social group." The BIA first interpreted the phrase in *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985), *overruled on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 201 (BIA 1985). There, the alien argued that voluntary members of a taxi cab cooperative who refused to yield to anti-government guerrillas in El Salvador constituted a "particular social group." The guerrillas "targeted small businesses in the transportation industry for work stoppages, in hopes of damaging El Salvador's economy." 19 I. & N. Dec. at 216. The BIA rejected that claim. It noted that the UN Protocol refers to race, religion, nationality and political opinion, as well as membership in a particular social group. It then applied the principle of *ejusdem generis*,[7]  and

---

[7] "(T)he '*ejusdem generis* rule' is, that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things in the same general kind or class as those specifically mentioned. The rule, however, does not necessarily require that the general provision be limited in

(continued...)

interpreted "persecution on account of membership in a particular social group" as used in the INA

> to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group

---

[7](...continued)
its scope to the identical things specifically named. Nor does it apply when the context manifests a contrary intention." *United States v. Walasek*, 527 F.2d 676, 679 n.10 (3d Cir. 1975) (quoting Black's Law Dictionary 608 (Rev. 4th ed. 1968).

> either cannot change, or should not
> be required to change because it is
> fundamental to their individual
> identities or consciences.

*Id*. at 233-34. The BIA reasoned that the proffered group was not a "particular social group" within the meaning of the INA because the identifying characteristic (being a taxi driver who refused to participate in guerilla-sponsored work stoppages) was not immutable. The taxi drivers could avoid any persecution by changing jobs or acceding to the guerrillas' demands to participate in work stoppages, and the BIA did not consider either fundamental to identity or conscience. *Id*. at 234.

In subsequent cases, the BIA relied upon *Acosta* in finding that a number of groups constituted a "particular social group" under the INA. In *Matter of Fuentes*, 19 I. & N. Dec. 658 (BIA 1988), the BIA held that "former members of the national police of El Salvador" could form a "particular social group" because the alien's status as a former policeman is "an immutable characteristic, as it is one beyond the capacity of the [alien] to change." *Id*. at 662. In *Matter of Toboso-Alfonso*, 20 I. & N. Dec. 819 (BIA 1990), the BIA held that homosexuals in Cuba could constitute a "particular social group" because the Cuban government required homosexuals to register, report regularly and to undergo physical examinations and that "once registered by the Cuban government as a homosexual, that characteristic [was not] subject to change." *Id*. at 821-23. In *In re H-*, 21 I. & N. Dec. 337 (BIA 1996), the BIA found a familial sub-clan in Somalia to be a "particular social group." The BIA explained: "The record before us makes clear not only

that the Marehan share ties of kinship, but that they are identifiable as a group based upon linguistic commonalities." *Id*. at 343. In *In re Fauziya Kasinga*, 21 I. & N. Dec. 357 (BIA 1996), the BIA found a "particular social group" to be "young women of the Tchamba-Kunsunto Tribe who had not had been subjected to FGM [female genital mutilation] as practiced by that tribe, and who oppose the practice." *Id*. at 365. The BIA reasoned:

> In accordance with *Acosta*, the particular social group is defined by common characteristics that members of the group cannot change, or should not be required to change because such characteristics are fundamental to their individual identities. The characteristics of being a "young woman" and a "member of the Tchamba-Kunsunto Tribe" cannot be changed. The characteristic of having intact genitalia is one so fundamental to the individual identity of a young woman that she should not be required to change it.

*Id*. at 366. In *In re V-T-S*, 21 I. & N. Dec. 792 (BIA 1997), the BIA found that "Filipinos of mixed Filipino-Chinese ancestry" constituted a "particular social group" because the characteristics of being a Filipino of mixed Filipino-Chinese ancestry "are . . . immutable." *Id*. at 798. The BIA also relied on country reports that showed that "[a]pproximately 1.5

27

percent of the Philippine population has an identifiable Chinese background." *Id*.

However, in *Matter of Vigil*, 19 I. & N. Dec. 572 (BIA 1988), the BIA held that the group of "young, male, unenlisted, urban Salvadorans" was not a "particular social group" because the factors which identify the group "are not factors that are 'fundamental to individual identity or conscience.'" *Id*. at 574-75.

*In re R-A*, 22 I. & N. Dec 906 (BIA 1999),[8] the BIA began to add to its interpretation of the term "particular social group" as enunciated in *Acosta*. The asylum applicant was a

_____

[8]*In re R-A* was later vacated by the Attorney General in anticipation of new rules. *In re R-A*, 22 I. & N. Dec. 906 (A.G. Jan. 19, 2001). The proposed rule sought comment about, *inter alia*, whether or not claims involving domestic violence might be "conceptualized and evaluated within the framework of asylum law." Government's Br. at 27 n.7. Ultimately, the Attorney General directed the BIA to refer the case to him for review, and remanded the case to the BIA for reconsideration because no final rule had been issued. *Id*. In doing so, the Attorney General recognized the four new decisions of the BIA concerning "particular social group," all of which rested upon the analysis of *In re R-A*. *Id*. We discuss those cases below; however, because the BIA's language in *In re R-A* is so important to the claim before us here, we take the liberty of quoting the BIA's reasoning in *In re R-A* at length.

28

Guatemalan woman who was the victim of horrific domestic violence. The IJ found that the applicant had been persecuted because of her membership in the particular social group of "Guatemalan women who have been intimately involved with Guatemalan male companions, who believe that women are to live under male domination." *Id*. at 911. The BIA rejected that grouping as qualifying for relief under the INA. The BIA explained that the group the IJ accepted:

> appears to have been defined principally, if not exclusively, for purposes of this asylum case, and without regard to the question of whether anyone in Guatemala perceives this group to exist in any form whatsoever. . . [T]he group is defined largely in the abstract. It seems to bear little or no relation to the way in which Guatemalans might identify subdivisions within their own society or otherwise perceive individuals to possess or lack an important characteristic or trait. The proposed group may satisfy the basic requirement of containing an immutable or fundamental individual characteristic. *But, for the group to be viable for asylum purposes, we believe there must also be some showing of how the characteristic is understood in the alien's society,*

29

> *such that we, in turn, may understand that the potential persecutors in fact see persons sharing the characteristic as warranting suppression or the infliction of harm.*

*Id*. at 918 (emphasis added).  In referring to its prior reliance on the doctrine of *ejusdem generis* in *Acosta*, the BIA explained:

> [W]e have ruled that the term "particular social group" is to be construed in keeping with the other four statutory characteristics that are the focus of persecution: race, religion, nationality, and political opinion.  These other four characteristics are ones that typically separate various factions within countries. . ..

> In the present case, the [applicant] has shown that women living with abusive partners face a variety of legal and practical problems in obtaining protection or in leaving the abusive relationship.  *But, the [applicant] has not shown that "Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live*

30

*under male domination" is a group that is recognized and understood to be a societal faction, or is otherwise a recognized segment of the population, in Guatemala. The [applicant] has shown neither that the victims of spouse abuse view themselves as members of this group, nor, most importantly, that their male oppressors see their victimized companions as part of this group. . ..*

if the alleged persecutor is not even aware of the group's existence, it becomes harder to understand how the persecutor may have been motivated by the victim's "membership" in the group to inflict the harm.

The [applicant's] showing fails in another respect, one that is noteworthy in our ruling of *Matter of Kasinga*. She has not shown that spouse abuse itself is an important societal attribute, or, in other words, that the characteristic of being abused is one that is important within Guatemalan society. The [applicant] has shown

31

official tolerance of her husband's cruelty toward her. But, for "social group" purposes, she has not shown that women are expected by society to be abused, or that there are any adverse societal consequences to women or their husbands if the women are not abused. *While not determinative, the prominence or importance of a characteristic within a society is another factor bearing on whether we will recognize that factor as part of a "particular social group" under our refugee provisions. If a characteristic is important in a given society, it is more likely that distinctions will be drawn within that society between those who share and those who do not share the characteristic*.

\* \* \*

The starting point for "social group" analysis remains the existence of an immutable or fundamental individual characteristic in accordance with *Matter of Acosta*. *We never declared, however, that the starting*

32

*point for assessing social group claims articulated in Acosta was also the ending point. The factors we look to in this case, beyond Acosta's "immutableness" test, are not prerequisites, and we do not rule out the use of additional considerations that may properly bear on whether a social group should be recognized in an individual case.* But these factors are consistent with the operation of the other four grounds for asylum and are therefore appropriate, in our judgment, for consideration in the "particular social group" context.

*Id*. at 918-20 (emphasis added).

While the BIA was deciding whether social groups proposed by asylum applicants constituted a "particular social group" under the INA, various courts of appeals were also trying to make sense of the concept. In *Fatin v. INS*, *supra*, we held that the BIA's construction of the term "particular social group" in *Matter of Acosta* was a permissible construction of the Immigration and Nationality Act and, therefore, entitled to

33

*Chevron* deference.[9]  12 F.3d at 1240.  Accordingly, we adopted that construction.[10]  *Id*.  Applying the *Acosta* construction, we recognized as a "particular social group" a group  "consist[ing] of Iranian women who [found] their country's gender-specific laws offensive and [did] not wish to comply with them."  *Id*. at 1241.  However, we affirmed the BIA's denial of relief because the alien had not established the requisite persecution.  *Id*. at 1243.

Following our adoption of the *Acosta* construction, we held that the group of former child soldiers who had escaped a guerrilla organization's army constitutes a "particular social group" within the meaning of the INS.  *Lukwago v. Ashcroft*, 329 F.3d 157, 178-79 (3d Cir. 2003).  However, we held that homeless street children in Honduras did not.  *Escobar v.*

[9]In *INS v. Cardoza-Fonseca*, 480 U.S. 421, 445-50 (1987), the Supreme Court held that the BIA's interpretation of the Refugee Act is entitled to deference pursuant to the standards set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

[10]Several other courts of appeals have adopted the *Acosta* construction. *See Niang v. Gonzales*, 422 F.3d 1187, 1199 (10th Cir. 2005); *Castellano-Chacon v. INS*, 341 F.3d 533, 546-48 (6th Cir. 2003); *Yadegar-Sargis v. INS*, 297 F.3d 596, 603 (7th Cir. 2002); *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000); *Safaie v. INS*, 25 F.3d 636, 640 (8th Cir. 1994); *Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir. 1993).

*Gonzales*, 417 F.3d 363, 367 (3d Cir. 2005). In *Escobar,* we explained: "Poverty, homelessness and youth are far too vague and all encompassing to be characteristics that set the perimeters for a protected group within the scope of the [INA]." *Id*. at 367.

Other courts of appeals have used variations of the *Acosta* interpretation of "particular social group." The Court of Appeals for the Ninth Circuit has defined it as:

> [A] collection of people closely affiliated with each other, who are actuated by some common impulse or interest. Of central concern is the existence of a voluntary associational relationship among the purported members, which imparts some common characteristic that is fundamental to their identity as a member of that discrete social group.

*Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986).[11]

_____

[11]The Ninth Circuit later recognized that groups sharing immutable characteristics, such as familial identity or sexual identity, could also be considered social groups within the meaning of the INA. *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (holding that a "'particular social group' is one united by a voluntary association, including a

(continued...)

The Court of Appeals for the Second Circuit has defined the grouping as one "comprised of individuals who possess some fundamental characteristic in common which serves to distinguish them in the eyes of a persecutor – or in the eyes of the outside world in general." *Gomez v. INS*, 947 F.2d 660, 664 (2d Cir. 1991) (citations omitted). Under that definition, "the attributes of a particular social group must be recognizable and discrete." *Id*.

Beginning in 2006, the BIA added additional considerations to its definition of "particular social group" as first articulated in *Acosta*. In *In re C-A*, 23 I. & N. Dec. 951 (BIA 2006), *aff'd sub nom. Castillo-Arias v. Attorney General*, 446 F.3d 1190 (11th Cir. 2006), the BIA held that the "social visibility" of the members of a claimed social group is an important consideration in identifying the existence of a 'particular social group.'" *Id*. It also held that "particularity" was an element in the particular social group analysis. *Id*. at 957. Accordingly, the group of "former noncriminal drug informants working against the Cali drug cartel" was not a "particular social group" because the group [did] not have "social visibility." *Id.* There, the BIA began its analysis with the definition used in *Acosta*. *Id*. at 955. It then noted that

---

[11](...continued)
former association, *or* by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it."), *overruled on other grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005) (en banc).

some of its prior decisions involving particular social groups "have considered the recognizability, i.e., the social visibility, of the group in question. Social groups based on innate characteristics such as sex or family relationship are generally easily recognizable and understood by others to constitute social groups. " *Id.* at 959 (citing *Matter of H-*). However, and rather inexplicably, the Board also noted that some of its other decisions "involved characteristics that were highly visible and recognizable by others in the country in question." *Id.* at 960 (citing, *inter alia*, *Matter of Kasinga*; *Matter of Toboso-Alfonso*; and *Matter of Fuentes*). Finally, the Board explained that "the two illustrations of past experiences that might suffice for social group membership in *Matter of Acosta*, i.e., "former military leadership or land ownership," are easily recognizable traits. *Id.*

The BIA noted that because visibility is an important element in identifying the existence of a particular social group, confidential informants do not have that requisite social visibility  because the "very nature" of being a confidential informant "is such that it is generally out of the public view. In the normal course of events, an informant against the Cali cartel intends to remain unknown and undiscovered." *Id.* Thus, the BIA found the proposed group did not qualify for relief as a "particular social group" under the INA.

The BIA also considered whether the group was defined with the requisite particularity, and concluded that the proposed group of "noncriminal informants" was "too loosely defined to meet the requirement of particularity." *Id.* at 957.

37

In *In re A-M-E & J-G-U*, 24 I. & N. Dec. 69 (BIA 2007), *aff'd sub nom. Ucelo-Gomez v. Mukasey*, 509 F.3d 70 (2d Cir. 2007), the BIA returned to the concepts of social visibility and particularity. There, the BIA opined that the "[f]actors to be considered in determining whether a particular social group exists include whether the group's shared characteristic gives the members the requisite social visibility to make them readily identifiable in society and whether the group can be defined with sufficient particularity to delimit its membership." *Id*. at 69. The proposed group was affluent Guatemalans who, it was alleged, are at a greater risk of crime in general or who are subject to extortion or robbery in particular. The BIA found that "there is little in the background evidence of record to indicate that wealthy Guatemalans would be recognized as a group that is at a greater risk of crime in general or extortion or robbery in particular." *Id*. at 74. The BIA noted that "violence and crime in Guatemala appear to be pervasive at all socio-economic levels." *Id*. at 75. Because of the pervasive nature of crime "even people with relatively modest resources or income may possess sufficient land, crops, or other forms of wealth to make them potential targets" of criminals. *Id*. Accordingly, the BIA held that the proposed group of affluent Guatemalans "fails the 'social visibility' test." *Id*.

The BIA also found that the group did not satisfy the requirement of "particularity:"

> The terms "wealthy" and "affluent" standing alone are too amorphous to provide an adequate benchmark for determining group membership. Depending on one's perspective,

38

the wealthy may be limited to the very top echelon; [or] might include small business owners and others living a relatively comfortable existence in a generally impoverished country. Because the concept of wealth is so indeterminate, the proposed group could vary from as little as 1 percent to as much as 20 percent of the population, or more. . . . The characteristic of wealth or affluence is simply too subjective, inchoate, and variable to provide the sole basis for membership in a particular social group.

*Id*. at 76.

As noted, the BIA has applied its "social visibility" and "particularity" requirements to proposed groups who resisted gang recruitment efforts. In *Matter of S-E-G*, 24 I. & N. Dec. 579 (BIA 2008)[12], one of the proposed groups was: "Salvadoran

_____

[12]On August 26, 2008, a petition for review was docked with the Court of Appeals for the Eighth Circuit *sub nom. Gonzales-Mira v. Mukasey*, No. 08-2925 (8th Cir. 2008). On July 28, 2009, the BIA reopened the case and remanded, but it did not vacate the precedential decision. On

(continued...)

youth who have been subjected to recruitment efforts by MS-13 and who have rejected membership based on their own personal, moral, and religious opposition to the gang's values and activities." *Id*. at 579. There, the BIA explained that it was guided by its recent holdings in *Matter of A-M-E & J-G-U* and *Matter of C-A* and held that: "membership in a purported social group requires that the group have particular and well-defined boundaries, and that it possess a recognized level of social visibility." *Id*. at 582. The BIA believed that "[t]hese concepts of 'particularity' and 'social visibility' give greater specificity to the definition of a social group, which was first determined in *Matter of Acosta*." *Id*.

With regard to "particularity," the BIA wrote:

> The essence of the particularity requirement . . . is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of

---

[12](...continued) September 9, 2009, the Court of Appeals for the Eighth Circuit granted the government's motion to dismiss for lack of jurisdiction, and did not grant the petitioner's request that the court vacate the precedential opinion in light of the BIA's order reopening. *Gonzales-Mira v. Holder*, Nos. 08-2925, 09-2678 (8th Cir. Sept. 9, 2009).

persons. While the size of the proposed group may be an important factor in determining whether the group can be so recognized, the key question is whether the proposed description is sufficiently particular, or is too amorphous . . . to create a benchmark for determining group membership.

*Id*. at 584 (citation and internal quotation marks omitted). The BIA held that the proposed group lacked particularity. The BIA explained that the group "make[s] up a potentially large and diffuse segment of society, and the motivation of gang members in recruiting and targeting young males could arise from motivations quite apart from any perception that the males in question were members of a class." *Id*.

The BIA held that the proposed group lacked "social visibility" as well. It wrote:

The question whether a proposed group has a shared characteristic with the requisite "social visibility" must be considered in the context of the country of concern and the persecution feared. The [applicants] in this case are victims of harassment, beatings, and threats from a criminal gang in El Salvador. There is little in the

41

background evidence of record to indicate that Salvadoran youth who are recruited by gangs but refuse to join . . . would be perceived as a group by society, or that these individuals suffer from a higher incidence of crime than the rest of the population.

The [applicants] assert that the have a specific reason (i.e., their refusal to join the gang) to fear the MS-13 would subject them to more violence than the general population. We do not doubt . . . that gangs such as MS-13 retaliate against those who refuse to join their ranks. However, such gangs have directed harm against anyone and everyone perceived to have interfered with, or who might present a threat to, their criminal enterprises and territorial power. The [applicants] are therefore not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang's interests.

*Id*. at 586-87.

The BIA denied relief because the proposed group lacked "particularity" and "social visibility," and was therefore, not a "particular social group."[13]

In *Matter of E-A-G*, 24 I. & N. Dec. 591 (BIA 2008), the BIA held*, inter alia*, that Honduran males who resisted gang recruitment did not constitute a "particular social group" within the meaning of the INA. It explained:

> [T]he particular social group identified . . . as "persons resistant to gang membership" lacks the social visibility that would allow others to identify its members as part of such a group. Persons who resist joining gangs have not been shown to be part of a socially visible group within Honduran society, and the [applicant] does not allege that he possesses any characteristics that would cause others in Honduran society to recognize him as one who has refused gang recruitment. Of course, individuals who resist gang

---

[13]In *Santos-Lemus v. Mukasey*, 542 F.3d 738, 744-747 (9th Cir. 2008), the court of appeals relied on *Matter of S-E-G* and its own precedent in concluding that the proposed group of "young men in El Salvador resisting gang violence" lacks the "social visibility" and "particularity" to constitute a "particular social group" within the meaning of the INA.

43

recruitment may face the risk of harm from the refused gang. But such a risk would arise from the individualized reaction of the gang to the specific behavior of the prospective recruit. There is no showing that membership in a larger body of persons resistant to gangs is of concern to anyone in Honduras, including the gangs themselves, or that individuals who are part of that body of persons are seen as a segment of the population in any meaningful respect.

*Id*. at 594-95.

We include this rather lengthy summary of the legal landscape surrounding claims of "a particular social group" in order to address Valdiviezo-Galdamez's argument that the BIA erred by applying a new standard to adjudicate his claim. We understand Valdiviezo-Galdamez to be arguing that the BIA erred because it based its rejection of his claim on *Matter of S-E-G* and *Matter of E-A-G*, which were decided on July 30, 2008, which he submits was past the time in which he could have filed briefs addressing those decisions.[14] However, the

---

[14]On June 15, 2005, the IJ denied Valdiviezo-Galdamez's applications for relief. On February 27, 2006, the

(continued...)

44

concepts of "social visibility" and "particularity" discussed in *Matter of S-E-G* and *Matter of E-A-G* did not originate in those cases.  Rather, as we have explained, both concepts arise from *In re C-A* and *In re A-M-E & J-G-U*, which were decided prior to our remand of Valdiviezo-Galdamez's case on September 7, 2007.[15]  Thus, the BIA did not apply a new standard to determine membership in a "particular social group."  Rather, the BIA simply applied two other cases involving gang recruitment-based social group claims in which the requirements of "social visibility" and "particularity" were discussed and applied.

### B.  The BIA erred by applying a new standard to determine membership in a "particular social group" without providing Valdiviezo-Galdamez with notice or an

---

[14](...continued)
BIA summarily affirmed the IJ.  On September 7, 2007, we remanded to the BIA for a determination of whether Valdiviezo-Galdamez's proposed social group was a "particular social group" within the meaning of the INA.

On April 9, 2008, the BIA issued a briefing schedule, informing the parties that briefs were due by April 30, 2008. It later extended the filing deadline to May 31, 2008.  Two months later, on July 30, 2008, the BIA decided *Matter of S-E-G* and *Matter of E-A-G*.

[15]*In re C-A* was decided on June 15, 2006 and *In re A-M-E & J-G-U* was decided on January 31, 2007.

**opportunity to be heard.**

Valdiviezo-Galdamez submits that the BIA denied him due process by applying *Matter of S-E-G* and *Matter of E-A-G* to him without affording him notice of its intent to apply those cases to decide his appeal or giving him an opportunity to file a responsive brief. He contends that the BIA failed to send a copy of its notice of briefing to his attorneys of record, Martin P. Duffey and Ayodele Gansallo. *See* n.3, *supra*. He also contends that the government certified that it served the notice on Nicole Simon, who represented him in his first appeal to the BIA. However, he claims that there is no reason to believe that she received that notice because she had changed jobs and had changed her address. This claim is meritless.

As noted, *see* n.3, *supra*, no one entered an appearance with the BIA on Valdiviezo-Galdamez's behalf on remand. Thus, he had no attorney of record. Valdiviezo-Galdamez appeared *pro se* and did not file a brief. Moreover, even if Simon had changed her address, it was clearly her responsibility to advise the BIA of that change. *See* 8 C.F.R. § 1003.2(b)(1).

Valdiviezo-Galdamez also contends that he was deprived of due process because the BIA did not notify him that it intended to apply *Matter of S-E-G* and *Matter of E-A-G* to his case. This contention is also without merit. First, we know of no authority that would require the BIA to have notified Valdiviezo-Galdamez of the law it intended to apply to his case, and he offers none that would support his claim. *See Theagene v. Gonzales*, 411 F.3d 1107, 1112 (9th Cir. 2005) (finding that the asylum applicant "cited no authority for the proposition that

46

an alien's right to due process is . . . violated when the Board applies controlling legal authority to a pending case without informing the alien or providing an opportunity to respond"); *see also id*. at 113 ("Though a tribunal often requests supplemental briefs in such cases, applying new law to a pending case without notice does not, under any authority cited to us, offend due process."). Second, the BIA is required to apply new law to its review. *Ortiz v. INS*, 179 F.3d 1148, 1156 (9th Cir. 1999).

### C. The BIA's requirements of "social visibility" and "particularity" are contrary to the intent of the statute.

Valdiviezo-Galdamez submits that the requiring him to prove "social visibility" and "particularity" was contrary to the provisions of the INA. We interpret the argument as referring to the term "particular social group" contained in the 8 U.S.C. § 1101(a)(42)(A). As we have explained, Congress there defined the term "refugee" as used in the INA. However, his argument that the two requirements are contrary to the intent of the statute is problematic for reasons we explained in *Fatin*. There, we observed that the statutory language "standing alone is not very instructive" as to the meaning of the term "particular social group," and that "neither the legislative history of the relevant United States statutes nor the negotiating history of the pertinent international agreements sheds much light of the meaning of the phrase 'particular social group.'" 12 F.3d at 1239. That is why we looked to the BIA's interpretation of the phrase in *Matter of Acosta*, applied the *Chevron* analysis to that interpretation, found the BIA's interpretation permissible, and

47

held that the BIA's interpretation was entitled to *Chevron* deference.

### D. The BIA's requirements of "social visibility" and "particularity" are not entitled to *Chevron* deference.

As we have noted, *see* n.9, *supra*, in *INS v. Cardoza-Fonseca*, 480 U.S. 421, 445-50 (1987), the Supreme Court held that the BIA's interpretation of the Refugee Act is entitled to *Chevron* deference.   Therefore, in considering the BIA's interpretation of the Act, we ask "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.   If it has not, we may not "simply impose [our] own construction of the statute*." Id*. at 843.   "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*.

Valdiviezo-Galdamez contends that the BIA's requirement that a "particular social group" possess the elements of "social visibility" and "particularity" is not entitled to *Chevron* deference.

### (i). "Social Visibility"

In *In re C-A*, 23 I. & N. at 959-60, the BIA referred to "social visibility" alternatively as "recognizability."   In attempting to refine the concept of "social visibility," the Board explained that in its other decisions recognizing "particular social groups,"   the groups "involved characteristics that were

48

highly visible and recognizable by others in the country in question." In *In re A-M-U & J-G-U*, 24 I. & N. at 74, the BIA held that "social visibility" requires that the "shared characteristic of the group should generally be recognizable by others in the community" and that the "members of the group are perceived as a group by society."

Valdiviezo-Galdamez contends that this requirement of "social visibility" is inconsistent with a number of the BIA's prior decisions and is therefore not entitled to deference under *Chevron.* We agree.[16]

In the wake of *Acosta*, the BIA recognized a number of groups as "particular social groups" where there was no indication that the group's members possessed "characteristics that were highly visible and recognizable by others in the country in question" or possessed characteristics that were otherwise "socially visible" or recognizable. Indeed, we are

[16]We do note, however, that the Court of Appeals for the First, Second, Eighth, Ninth and Eleventh Circuits have all approved the BIA's "social visibility" requirement for a "particular social group" and have accorded it *Chevron* deference. *See, e.g., Scatambuli v. Holder*, 558 F.3d 53, 59-60 (1st Cir. 2009); *Ucelo-Gomez v. Mukasey*, 509 F.3d 70, 74 (2nd Cir. 2007); *Davila-Mejia v. Mukasey*, 531 F.3d 624, 629 (8th Cir. 2008); *Santos-Lemus v. Mukasey*, 542 F.3d 738, 746 (9th Cir. 2008); *Castillo-Arias*, 446 F.3d 1190, 1196 (11th Cir. 2006).

hard-pressed to understand how the "social visibility" requirement was satisfied in prior cases using the *Acosta* standard. By way of examples noted above, the BIA has found each of the following groups to constitute a "particular social group" for purposes of refugee status: women who are opposed to female genital mutilation (*Matter of Kasinga*), homosexuals required to register in Cuba, (*Matter of Toboso-Alfonso*), and former members of the El Salvador national police (*Matter of Fuentes*). Yet, neither anything in the Board's opinions in those cases nor a general understanding of any of those groups, suggests that the members of the groups are "socially visible." The members of each of these groups have characteristics which are completely internal to the individual and cannot be observed or known by other members of the society in question (or even other members of the group) unless and until the individual member chooses to make that characteristic known.

If a member of any of these groups applied for asylum today, the BIA's "social visibility" requirement would pose an unsurmountable obstacle to refugee status, even though the BIA has already held that membership in any of these groups qualifies for refugee status if an alien can establish that s/he was persecuted "on account of" that group membership.

Although we afforded the BIA's interpretation of "particular social group" *Chevron* deference in *Fatin*, this did not give the agency license to thereafter adjudicate claims of social group status inconsistently, or irrationally. "Agencies are *not* free, under *Chevron*, to generate erratic, irreconcilable interpretations of their governing statutes . . . Consistency over time and across subjects is a relevant factor [under *Chevron*]

50

when deciding whether the agency's current interpretation is 'reasonable.'" *Marmolejo-Campos v. Holder*, 558 F.3d 903, 920 (9th Cir. 2009) (Berzon, J., dissenting) (citing *Cardozo-Fonseca*, 480 U.S. at 446 n.30) (emphasis in original). Since the "social visibility" requirement is inconsistent with past BIA decisions, we conclude that it is an unreasonable addition to the requirements for establishing refugee status where that status turns upon persecution on account of membership in a particular social group.

We are not the only court of appeals to express concerns about the BIA's requirement of "social visibility." In *Gatimi v. Holder*, 578 F.3d 711 (7th Cir. 2009), Gatimi was a Kenyan and a member of the Kikuyu tribe. That tribe dominated Kenyan politics at the relevant times. In 1995, Gatimi joined a Kikuyu group called the "Mungiki." Tribal practices included compelling women to undergo female genital mutilation. Gatimi defected from the Mungiki in 1999. As a result, he was subsequently kidnaped and tortured by members of the Mungiki group. That group also repeatedly sought out Gatimi's wife in order to have her undergo female genital mutilation. Ultimately, the family fled to United States and sought asylum.

An IJ denied Gatimi's application for asylum, holding, *inter alia*, that defectors from the Mungiki did not constitute a "particular social group." The BIA affirmed on that basis. On Gatimi's petition for review, the Court of Appeals for the Seventh Circuit noted that in one of its prior decisions, *Sepulveda v. Gonzales*, 464 F.3d 770 (7th Cir. 2006), it had held that:

> [F]ormer subordinates of the

51

attorney general of Colombia who had information about the insurgents plaguing that nation were a "particular social group." They had been targeted for assassination by the insurgents, and many had been assassinated. While an employee could resign from the attorney general's office, he could not resign from a group defined as former employees of that office; once a former employee, always a former employee (unless one is reemployed by one's former employer).

*Gatimi*, 578 F.3d at 615. In adjudicating Gatimi's petition for review, the court reasoned: "[w]e cannot see how this case can be distinguished from *Sepulveda*, which the [BIA] did not cite." *Id*. Instead, the court of appeals noted that the BIA had cited cases "which hold that a group must have 'social visibility' to be a member of a 'particular social group[.]'" Applying the "social visibility" formula, the BIA had found that:

there was no evidence that Gatimi possesses any characteristics that would cause others in Kenyan society to recognize him as a former member of Mungiki. . . . There is no showing that membership in a larger body of persons resistant to Mungiki is of concern to anyone in Kenya or that such individuals are seen as a segment of the

52

population in any meaningful respect.

*Id*.

The court of appeals concluded that "[t]his formula [i.e., "social visibility"] cannot be squared with *Sepulveda*." *Id*. Significantly for our purposes, the court of appeals went on to say:

> [social visibility] makes no sense; nor has the Board attempted, in this or any other case, to explain the reasoning behind the criterion of social visibility. Women who have not yet undergone female genital mutilation in tribes that practice it do not look any different from anyone else. A homosexual in a homophobic society will pass as heterosexual. If you are a member of a group that has been targeted for assassination or torture or some other mode of persecution, you will take pains to avoid being socially visible; and to the extent that the members of the target group are successful in remaining invisible, they will not be "seen" by other people in the society "as a segment of the population." Those former employees of the Colombian attorney general tried hard, one can be sure, to become invisible and, so far as appears, were unknown to Colombian society as a whole.

*Id*. We agree.

The court then explained the distinction between Gatimi's situation and that which confronted the Supreme Court in *Gonzales v. Thomas*, 547 U.S. 183 (2006):

> We are mindful of the Supreme Court's admonition to the courts of appeals in *Gonzales v. Thomas . . . ,* that the Board's definition of "particular social group" is entitled to deference. The issue in that case was whether a family could be a particular social group, a difficult issue on which the Board had not opined; and the Court held that the Board should have an opportunity to do so. But regarding "social visibility" as a criterion for determining "particular social group," the Board has been inconsistent rather than silent. It has found groups to be "particular social groups" without reference to social visibility,

*Id.* (citing *In re Kasinga, In re Toboso-Alfonso, In re Fuentes* and *In re Acosta*).

"When an administrative agency's decisions are inconsistent, a court cannot pick one of the inconsistent lines and defer to that one, unless only one is within the scope of the agency's discretion to interpret the statutes it enforces or to

54

make policy as Congress's delegate." *Id*. at 616. The *Gatimi* court noted that other courts of appeals had deferred to the Board on this issue, but the mere fact that some appellate courts disagreed with its analysis was not persuasive. As the court explained: "We just don't see what work "social visibility" does; the candidate groups flunked the basic "social group" test . . . declared in . . . *Acosta* (where the test originated)." 578 F.3d at 616.

The court of appeals reiterated its criticism of the Board's handling of "particular social group" claims in *Benitez Ramos v. Holder*, 589 F.3d 426 (7th Cir. 2009). There, the BIA had denied an alien's application for relief from removal based on his claim that he was entitled to refugee status as a "tatooed, former Salvadoran gang member." The petitioner had joined the gang when he was fourteen, but subsequently came to the United States and became a "born-again Christian." He argued that if returned to El Salvador, he would be recognized as a gang member because of his tattoos and forced to engage in practices which violated his religious scruples. The BIA concluded that the group that he claimed to be a member of did not constitute a "particular social group" under the INA. *Id*. at 429. On review before the court of appeals, the government relied on past BIA decisions and argued "that to be a 'particular social group' a group must have 'social visibility.'" *Id*. at 430. In rejecting that position, the court explained:

> By this the government means –
> and its lawyer was emphatic at
> argument . . . that you can be a
> member of a particular social group

55

only if a complete stranger could identify you as a member if he encountered you in the street, because of your appearance, gait, speech pattern, behavior or other discernable characteristic.

This position has some judicial support, . . ., but we have rejected it in *Gatimi* and other cases cited in *Gatimi*, as a misunderstanding of the use of "external" criteria to identify a social group . . . . "Visibility" in the literal sense in which the Board sometimes used the term might be relevant to whether there is persecution, but it is irrelevant to whether if there is persecution it will be on the ground of group membership. Often it is unclear whether the Board is using the term "social visibility" in the literal sense, or in the "external criterion" sense, or even-whether it understands the difference.

*Id* (citations omitted). .

Here, the government contends that "social visibility"

56

does not mean on-sight visibility.[17]  Rather, we are told that "social visibility" is a means to discern the necessary element of group perceptibility, i.e., the existence of a unifying characteristic that makes the members understood by others in society to constitute a social group or recognized as a discrete group in society.  We have a hard time understanding why the government's definition does not mean "on-sight visibility," and we join the Court of Appeals for the Seventh Circuit in wondering "even-whether [the BIA] understands the difference."

As the courts have noted, members of some persecuted groups that have been recognized as a "particular social group" would certainly take pains to avoid being identified in a society where they would face persecution if government agents knew they belonged to the group.[18]  Yet, by attempting to avoid persecution by blending in to the society at large, the Boards' rational would cause them to forfeit eligibility for asylum based on the persecution they would experience if recognized as a member of the particular social group in their society.

Thus, the government's attempt to add gloss to the BIA's reliance on "social visibility" is at odds with the phrase itself as

[17]The government makes this contention despite its apparent concession to the contrary in *Benitez Ramos*, 598 F.3d at 430, cited *supra*.

[18] *See Matter of Kasinga*, *Matter of Toboso-Alfonso*, and *Matter of Fuentes*, discussed, *supra*.

well as the BIA's definition in *In C-A* and *In re A-M-U & J-G-U.* Indeed, rather than adding gloss to the BIA's interpretation, the government seems to be attempting to spackle over the cracks in the way the BIA has approached social group cases. The government's position appears to be little more than an attempt to avoid the tension arising from the BIA's various interpretations of that phrase, and the fact that the BIA's present interpretation would have excluded the asylum claims that were granted in *In re Kasinga*, *In re Toboso-Alfonso*, and *In re Fuentes.* As we have noted, in each of those cases, the aliens' social group claim was successful, even though the group in question was not "socially visible." Thus, we reject the government's attempt to graft that requirement onto Valdiviezo-Galdamez's claim here. For similar reasons, the government's attempt to graft the requirement of "particularity" onto social group claims fares no better.

### (ii). "Particularity"

Valdiviezo-Galdamez also argues that the BIA's requirement of "particularity" should not be afforded *Chevron* deference. In *Matter of S-E-G*, the BIA explained:

> The essence of the particularity requirement . . . is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons. While the size of the proposed group may be an

58

important factor in determining whether the group can be so recognized, the key question is whether the proposed description is sufficiently particular, or is too amorphous . . . to create a benchmark for determining group membership.

24 I. & N. Dec. at 584 (citation and internal quotation marks omitted). Valdiviezo-Galdamez, presumably focusing on the second sentence in the definition of "particularity," contends that there is nothing in the statutory language that suggests that Congress intended to place any numerical limitation on the protected ground of a "particular social group." He notes that, in deferring to the BIA under *Acosta*, courts of appeals have said that "particular social group" " encompass[es] any group, however populous, persecuted because of shared characteristics that are either immutable or fundamental." *Gao v. Gonzales*, 440 F.3d 62, 67 (2d Cir. 2006), *vacated on other grounds sub nom. Keisler v. Gao*, 552 U.S. 801 (2007). Accordingly, Valdiviezo-Galdamez submits that the BIA's attempt to impose a numerical limitation is not entitled to deference.

The government responds by arguing that the "particularity" requirement is not an attempt to impose a numerical limitation on the size of a "particular social group." According to the government, "particularity" merely functions to assess whether a proposed group has definable boundaries so that it can constitute a distinct group, or a discrete class of persons. In the government's view, "particularity" serves a

59

different function from "social visibility" in determining whether the asylum applicant has described a cognizable social group. Thus, according to the government, "social visibility" assesses whether the applicant has identified a group with a unifying characteristic that is perceived as discrete or set apart by the society, while "particularity" examines whether the proposed unifying characteristic for the proposed group is definable, as opposed to being too diffuse or subjective. The government argues that these two concepts are related, but distinct and that they have complimentary functions.

We do not believe that the government is using particularity to impose a numerical or size limitation on the meaning of "particular social group." However, we are hard-pressed to discern any difference between the requirement of "particularity" and the discredited requirement of "social visibility." Indeed, they appear to be different articulations of the same concept and the government's attempt to distinguish the two oscillates between confusion and obfuscation, while at times both confusing and obfuscating. Indeed, "Particularity" appears to be little more than a reworked definition of "social visibility" and the former suffers from the same infirmity as the latter. The government's use of "particularity" is inconsistent with the prior BIA decisions discussed in the "social visibility" portion of this opinion. We therefore hold that adopting a "particularity" requirement is unreasonable because it is inconsistent with many of the BIA's prior decisions.

In sum, because the BIA's requirements that a "particular social group" possess the elements of "social visibility" and "particularity" are inconsistent with prior BIA decisions, those

60

requirements are not entitled to *Chevron* deference. By holding that the BIA's addition of the requirements of "social visibility" and "particularity" to the definition of "particular social group" it announced in *Acosta* is not entitled to *Chevron* deference, we do not suggest that the BIA cannot add new requirements to, or even change, its definition of "particular social group." Clearly, "an agency can change or adopt its policies." *Johnson v. Ashcroft*, 286 F.3d 696, 700 (3d Cir. 2002). However, an agency "acts arbitrarily if it departs from its established precedents without announcing a principled reason for its decision." *Id.* (citation and internal quotation marks omitted). If an agency "departs from an announced rule without explanation or an avowed alteration, such action could be viewed as arbitrary, capricious [or] an abuse of discretion." *Id.* (citation and internal quotation marks omitted) (bracket in original).[19] Here, as we have explained, the BIA's addition of the requirements of "social visibility" and "particularity" to its definition of "particular social group" is inconsistent with its prior decisions, and the BIA has not announced a "principled reason" for its adoption of those inconsistent requirements. Accordingly, we will grant the petition for review and remand to the BIA for further proceedings consistent with this opinion.

## 2. The BIA erred in holding that Valdiviezo-Galdamez was not

---

[19] Of course, the BIA must not only announce a "principled reason" for any changes it makes to its definition of "particular social group," any announced changes must be based on a permissible construction of the statute.

61

**eligible for asylum based upon his political opinion.**

When we previously remanded to the BIA, Valdiviezo-Galdamez also contended that he was entitled to asylum based on his political opinion. He asserted that "he was persecuted 'on account of his inherently political anti-gang opinion' as evident by his refusal to join the Mara Salvatrucha gang." App. 11. The BIA rejected this claim, finding that it was foreclosed by *INS v. Elias-Zacarias*, 502 U.S. 479 (1992). There, the Supreme Court held that a guerrilla organization's attempts to conscript a Guatemalan native into its military forces did not necessarily constitute persecution on account of political opinion.

The foundation of Valdiviezo-Galdamez's political opinion argument is his contention that his refusal to join a gang "was, by definition, the expression of a political opinion." Valdiviezo-Galdamez's Br. at 41. He rests that argument upon an unpublished decision in which an IJ held that a nineteen year old Honduran male's refusal to join Mara Salvatrucha was an expression of political opinion. *See Matter of D-V* (San Antonio, Texas Immigration Court, Sept. 2004). However, Valdiviezo-Galdamez offers no higher authority to support his contention that his refusal to join the Mara Salvatrucha was, by definition, the expression of a political opinion.

Moreover, even if we assume that refusal to join a gang is an expression of political opinion, there is no evidence that his refusal to join was taken by the gang as an expression of that political opinion. There is no evidence that he ever expressed to the gang that he was opposed to membership in the gang

62

because of his claimed political opinion. To the extent that his refusal to join the gang was based on his political opinion, his refusal was based on an internally held political opinion which cannot support a claim that he was persecuted on account of that political opinion. Holding a political opinion, without more, is not sufficient to show persecution on account of that political opinion. *Mendez-Barrera*, 602 F.3d 21, 27 (1st Cir. 2010). There must be evidence that the gang knew of his political opinion and targeted him because of it. *Id.* However, there is no such evidence here.

### 3. The BIA erred in denying Valdiviezo-Galdamez's application for relief under the CAT.

As noted, in denying Valdiviezo-Galdamez's application for relief under the CAT, the BIA first found that Valdiviezo-Galdamez "failed to establish that it is more likely than not that he will be subject[ed] to torture at the hands of the Mara Salvatrucha gang." App. 12. The BIA found that Valdiviezo-Galdamez's "numerous interactions" with the gang constituted "harassment." *Id.* It further found that the interactions "clearly did not involve the degree of 'severe pain and suffering' contemplated as constituting torture." *Id.* at 12-13. In sum, the BIA found that Valdiviezo-Galdamez's arguments regarding the likelihood of torture "are speculative and not based on evidence in the record." *Id.* at 13.

The BIA also concluded that even if it is assumed *arguendo* that it was more likely than not that he would be tortured at the hands of the gang, Valdiviezo-Galdamez "failed to establish that such torture would be "inflicted by or at the

63

instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* (quoting 8 C.F.R. § 1208.18(a)(1)).

In this portion of his petition for review, Valdiviezo-Galdamez contends that the BIA's denial of his application for relief under the CAT was error. We disagree.

Assuming *arguendo* that the treatment Valdiviezo-Galdamez suffered at the hands of the Mara Salvatrucha constituted torture, Valdiviezo-Galdamez must also show that the torture was inflicted with the "acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(2). "Acquiescence to torture requires only that government officials remain willfully blind to torturous conduct and breach their legal responsibility to prevent it." *Silva-Rengifo*, 473 F.3d at 70.

Valdiviezo-Galdamez points to testimony that he sought police protection on five different occasions, but the police were either not able to help, or not willing to help by prosecuting the gang members who were responsible. He testified that the police would always tell him that they were investigating but that at no point did he ever "see anything happen." Instead, Valdiviezo-Galdamez testified that he continued to suffer at the hands of the gang.

In Valdiviezo-Galdamez's view, the only reasonable inference that can be drawn from these facts is that the police were willfully blind to the gang's torturous conduct and breached their legal duty to prevent it. He rests his argument in

64

part upon *In re O-Z & I-Z*, 22 I. & N. Dec. 23, 26 (BIA 1998). There, the asylum applicant had reported at least three incidents of beatings and anti-Semitic threats, but the police took no action other than writing a report. The BIA found that sufficient to show that the government "was unable or unwillling to control the [alien's] attackers."[20]

However, as the government notes, Valdiviezo-Galdamez's proposed inference was not the only reasonable inference that could be drawn here, and the BIA drew a different, but equally reasonable inference from his testimony. The Board explained:

> We acknowledge that [Valdiviezo-Galdamez] testified that he made approximately five police reports concerning his numerous interactions with the gang, and that the police indicated that they were investigating the matter, but that he never saw any progress. However, the fact that [Valdiviezo-Galdamez] was unaware of progress in the investigation does not mean that the

---

[20]As noted earlier, a claim that the government was "unwilling or unable to control the the [alien's] attackers" is one which must be proven by an asylum applicant, not a claimant for relief under the CAT. We assume that Valdiviezo-Galdamez is citing to *In re 0-Z & I-Z* by way of an analogy.

police were not taking measures to deal with the problem in ways that were not obvious to [Valdiviezo-Galdamez]. Although [Valdiviezo-Galdamez's] testimony and the background materials in the record clearly reflect that criminal gangs are a problem in Honduras, the record also indicates that the government seeks to combat the problem and protect its citizens. *See, e.g.,* U.S. Department of State, *Honduras: Country Reports on Human Rights Practices – 2004* (February 2005) (Exh. 4) (indicating the existence of joint police and military patrols to combat crimes and gangs, and the existence of anti-gang legislation).

App. 13. Based upon that ambiguity in the testimony, and applicable Counttry Reports, the BIA found that the government of Honduras was not willfully blind to or did not acquiesce to the gang's activities.

We also reject Valdiviez-Galdamez's contention that the BIA could not rely on background materials in arriving at its conclusion that the government was not willfully blind or did not acquiese to the gang's activities. He bases that contention on a statement we made in a footnote in *Valdiviezo-Galdamez I.* We wrote, *inter alia*:

We cannot accept the government's contention that the background materials submitted at the hearing support the IJ's finding and denial of the asylum claim. First, the IJ did not address the relevant question: whether the government was "unwilling or unable" to control the gang members. Second, the materials referenced by the government describe the general negative attitude in Honduras towards "street children" and youths with tattoos, and do not describe with any detail efforts by the government to crack down on gangs. The most relevant statement in these materials is that: "During the year, nearly half of all military personnel were assigned for most of the time to joint patrols with police to prevent and combat high levels of criminal and gang violence." This does not refute Valdiviezo-Galdamez's credible testimony, which the IJ failed to address, that the police took no action in response to his complaints that he was repeatedly attacked by gang members. If anything, the evidence that gang violence is a

67

> serious problem in Honduras
> provides additional support for
> Valdiviezo-Galdamez's claims.

502 F.3d at 289 n.2.

The "most relevant statement" we referred to in footnote 2 is taken from the findings of the United States Department of State in *Honduras: Country Reports on Human Rights Practices, 2004* (Feb. 28, 2005). However, we do not believe that this statement from *Valdiviezo-Galdamez I* precluded the BIA from relying on country background materials on remand. At the outset, we note that in *Valdiviezo-Galdamez I* we were addressing whether the government was "unwilling or unable" to control the gang members. As we have noted, that is an appropriate inquiry in the context of an asylum claim. The "unwilling or unable to" standard is not applicable to a claim for relief under the CAT. Thus, the statement is *dicta*.

Moreover, even if the statement is interpreted as precluding the BIA from relying on the Country Report itself, the Country Report cited to other sources which dealt with the Honduran government's response to gang violence and activity. For example, the Report described a 2002 law "outlawing gang membership [and] prescrib[ing] prison terms from 3 to 12 years, depending upon the individual's level of involvement and seniority."

Moreover, the BIA did not rely solely on the Country Report. It also considered media articles on the government's enforcement of its anti-gang law. App. 13. A September 2003

68

article noted that "Honduran police have been making a regular practice in recent weeks of descending upon gang-ridden neighborhoods at dawn," and "hauling [young suspects] off to jail." App. 325. That same article noted that the Honduran President asserted that the police focused "only on gang leaders, with a goal of 2,000 arrests in the coming months." App. 326. It further noted that the President asserted that the "immediate result [was] a 70 percent drop in homicides and an increase in gang members looking to check into rehabilitation programs." App. 326

A February 2005 article cited a Presidential statement that Honduras was "winning its fight against violence, mainly by implementing" the anti-gang law. App. 332. In that same article, the President stated that, over the last three years, "Honduras has seen a 90 percent decrease in kidnappings and a 60 percent decrease in 'maras' activities, as 800 gang members out of a total of almost 2,000 who were originally arrested were now in jail." App. 332.

These media reports clearly support the BIA's finding that the "government seeks to combat the [gang] problem and protect its citizens." Thus, the BIA's conclusion that Valdiviezo-Galdamez failed to show that it was "more likely than not" that he would be tortured as a result of the alleged "willful[] blind[ness]" by the Honduran government was supported by substantial evidence. Accordingly, it did not err in denying Valdiviezo-Galdamez's application for relief under the CAT.

69

## VI.  CONCLUSION

For all of the above reasons, we will grant the petition for review and remand to the BIA for proceedings consistent with this opinion, but will deny the petition for review on the claim for relief under the CAT.

*Valdiviezo-Galdamez v. Atty Gen USA*
No. 08-4564
HARDIMAN, *Circuit Judge*, concurring in the judgment.

I agree with my colleagues that the BIA's decision in this case raises concerns warranting remand, but I write separately to express my understanding of the scope of the BIA's discretion upon remand. In my view, the BIA is free to adopt the additional requirements of "particularity" and "social visibility," exactly as the Board has defined and rationalized them over the last five years. The only problem that I find with the BIA's evolving approach to "particular social group" cases is that the Board has failed to acknowledge a change in course and forthrightly address how that change affects the continued validity of conflicting precedent. Accordingly, remand is necessary so the Board can either choose between its reasonable new requirements and its older but equally reasonable precedents, or reconcile the two interpretations in a coherent way.

In addition, I am troubled by the BIA's factfinding in this case. Should the BIA choose to adopt new requirements for "particular social group," I believe that it must also remand to the IJ for further factual development.

I

A

It is settled law that *Chevron* deference applies to BIA interpretations of "'ambiguous statutory terms'" in the INA. *Negusie v. Holder*, 129 S. Ct. 1159, 1163–64 (2009) (quoting *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999)) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467

1

U.S. 837, 842–43 (1984)). We have recognized that "particular social group," as used in the INA's definition of "refugee," 8 U.S.C. § 1101(a)(42)(A), is so ambiguous that "[b]oth courts and commentators have struggled to define [it]," and "[r]ead in its broadest literal sense, the phrase is almost completely open-ended." *Fatin v. INS*, 12 F.3d 1233, 1238 (3d Cir. 1993). There should be no question, then, that *Chevron* deference applies, as long as "the agency's [reading of the statute] is based on a permissible construction." *Chevron*, 467 U.S. at 843.

The Supreme Court recognized in *Chevron* that "[a]n initial agency interpretation is not instantly carved into stone." 467 U.S. at 863. It is therefore possible for the BIA's current interpretation of the statute to conflict with prior decisions without constituting an "impermissible" or "unreasonable" reading of the INA. The BIA must, however, provide "explanation or an 'avowed alteration,'" or its change "could be viewed as 'arbitrary, capricious, [or] an abuse of discretion.'" *Johnson v. Ashcroft*, 286 F.3d 696, 700 (3d Cir. 2002) (quoting *INS v. Yang*, 519 U.S. 26, 32 (1996)); *see also* Administrative Procedure Act, 5 U.S.C. § 706(2)(A). We have held that an agency may change course and reinterpret statutes "as long as it can justify its change with a 'reasoned analysis.'" *Horn v. Thoratec Corp.*, 376 F.3d 163, 179 (3d Cir. 2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)). In *FCC v. Fox, Television Stations, Inc.*, 129 S. Ct. 1800 (2009), the Supreme Court described the "reasoned analysis" requirement this way:

> To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display

2

awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates. This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. Sometimes it must—when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. It would be arbitrary or capricious to ignore such matters. In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.

129 S. Ct. 1800, 1811 (2009) (emphasis in original; citations omitted).

3

B

I agree with my colleagues that the BIA's "particularity" and "social visibility" requirements are changes in position from the longstanding test the BIA articulated in *Matter of Acosta*, 19 I. & N. Dec. 211 (B.I.A. 1985), which for over twenty years—from 1985 until 2006[1]— provided the most widely-adopted definition of "particular social group." *See generally Castillo-Arias*, 446 F.3d at 1196 (listing the six circuit courts of appeals, including the Third Circuit, that "deferred to the *Acosta* formulation," and two others that, "while not expressly deferring[,] . . . viewed *Acosta* favorably"). In *Acosta*, the BIA stated the requirements for establishing "persecution on account of membership in a particular social group" as follows:

> [W]e interpret the phrase 'persecution on account of membership in a particular social group' to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or

---

[1] *In re C-A-* was originally decided in August 2004, but it was not published or designated as precedent until June 2006. 23 I. & N. Dec. 951, 951 n.1 (B.I.A. 2006), *aff'd sub nom. Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190, 1196 (11th Cir. 2006), *cert. denied sub nom. Castillo-Arias v. Gonzales*, 127 S. Ct. 977 (2007).

4

land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.

19 I. & N. Dec. at 233. "Particularity" and "social visibility," as the BIA currently defines them, were not independent elements.[2]

The BIA introduced "particularity" as a stand-alone requirement in *In re C-A-*, finding that "noncriminal informants" is a group "too loosely defined to meet the requirement." 23 I. & N. Dec. 951, 957 (B.I.A. 2006). "Social visibility," on the other hand, was first mentioned in *In re R-A-* as a non-determinative factor—*not* a mandatory requirement—in the "particular social group" analysis. 22 I. & N. Dec. 906, 918–19 (B.I.A. 1999) (using indefinite terms like "frequently," "generally," "less likely" to describe the requirement and its justifications, and stating that "[t]he factors we look to in this case, beyond *Acosta*'s

---

[2] The word "particular" in the phrase "particular social group" was given no independent or operative meaning under the *Acosta* formulation. In my view, the BIA's recent decisions elevating "particularity" to its own requirement—along with the traditional *Acosta* requirements and "social visibility"—amounts to a change in the agency's interpretation of "particular social group," as a term of art.

5

'immutableness' test, are not prerequisites").[3] Like "particularity," "social visibility" was applied again in *In re C-A-*, 23 I. & N. Dec. at 959–961, and both became absolute requirements in *In re A-M-E- & J-G-U-*, 24 I. & N. Dec. 69, 74 (B.I.A. 2007) (referring to "the requirements of a *particular* social group" and "the requirement that the shared characteristic of the group generally be recognizable to others in the community." (emphasis in original)), *aff'd sub nom. Ucelo-Gomez v. Mukasey*, 509 F.3d 70 (2d Cir. 2007). Since *In re A-M-E-*, the BIA has treated these newly-minted elements as established precedent. *See In re A-T-*, 24 I & N. Dec. 296, 303 (B.I.A. 2007); *Matter of S-E-G-*, 24 I. & N. Dec. 579, 582 (B.I.A. 2008); *Matter of E-A-G-*, 24 I. & N. Dec. 591, 594–95 (B.I.A. 2008).

Although the BIA frames "particularity" and "social visibility" as merely "additional considerations" within the *Acosta* framework, *In re R-A-*, 22 I. & N. Dec. at 920, or the products of "evolving case law," *Matter of E-A-G-*, 24 I. & N. Dec. at 593, in practice, they have become stringent requirements that can be outcome-determinative in cases like this appeal. Where, as here, an applicant seems to meet the *Acosta* requirements but is denied asylum because he fails to show "particularity" and "social visibility," it appears that the

---

[3] Although the opinion in *In re R-A-* was vacated by Attorney General Janet Reno in 2001, it remains instructive when considering the history of, and reasoned explanation for, the "social visibility" requirement. It is also worth noting that the BIA explicitly limited *In re R-A-* to its facts, stating that it "d[id] not intend any categorical rulings as to analogous social group claims arising under any other conceivable set of circumstances." 22 I. & N. Dec. at 914.

BIA has changed course from its earlier, less stringent *Acosta* approach.

C

The Majority holds that: (1) because "the requirement of 'social visibility' is inconsistent with a number of the BIA's prior decisions[,] . . . [it] is therefore not entitled to deference under *Chevron*" and "is an unreasonable addition to the requirements for establishing refugee status . . . [based on] membership in a particular social group," and (2) because "'[p]articularity' appears to be little more than a reworked definition of 'social visibility[,]' . . . it suffers from the same infirmity as 'social visibility.'" Maj. Op. at 39, 41, 49. I disagree. As discussed above, agencies are free to change their interpretations of statutes, so the fact that there is a conflict between "social visibility" and prior BIA decisions does not necessarily mean *Chevron* deference does not apply. Nor does it mean that the BIA's definition of "social visibility" is "unreasonable."

In keeping with *Fox*, I would hold that the BIA may reinterpret "particular social group" to include whatever new requirements it sees fit—including "particularity" and "social visibility," defined exactly as they are in the line of cases from *In re R-A-* through *Matter of S-E-G-* and *Matter of E-A-G-*—as long as it "display[s] awareness that it *is* changing position" and "provide[s] reasoned explanation for its action." 129 S. Ct. at 1811 (emphasis in original). In order to exhibit such an awareness, I believe the Board must make a choice between these new requirements and its prior decisions granting "particular social group" status to applicants who would likely have been unable to show "particularity" or "social visibility." The Majority is correct that "the BIA's

7

present interpretation [of 'particular social group'] would have excluded the asylum claims that were granted in" cases decided in 1996, 1990, and 1988.  Maj. Op. at 46.  However, the problem arises not because of that fact, but rather because of the BIA's failure to recognize and address it.

I note that the BIA *has*, in my opinion, adequately explained the utility of adding "particularity" and "social visibility" to the *Acosta* test, and unlike the Majority, I am not convinced that the two requirements are identical.  According to *In re R-A-*, requiring "social visibility" allows the BIA to limit asylum to those individuals whose "potential persecutors in fact see persons sharing the [applicant's 'social group'] characteristic as warranting suppression or the infliction of harm."  22 I. & N. Dec. at 918.  As the BIA noted, "[i]f a characteristic is important in a given society, it is more likely that distinctions will be drawn within that society between those who share and those who do not share the characteristic."  *Id.* at 919.  In addition, "the social group concept would virtually swallow the entire refugee definition if common characteristics, coupled with a meaningful level of harm, were all that need be shown."  *Id.*  "Social visibility" therefore serves to limit the scope of "particular social group" to more closely match the other protected characteristics of race, religion, nationality, and political opinion.  *Id.* at 918.  Likewise, "particularity" was explained in *In re A-M-E-* as necessary to "delimit . . . potential members" of the purported "social group" and to allow the BIA to deny asylum claims based on membership in groups, the defining characteristics of which are "simply too subjective, inchoate, and variable."  24 I. & N. Dec. at 76.  If the Board were writing on a blank

8

slate, I would find that it has provided a reasoned explanation for a permissible interpretation of the law.[4]

---

[4] I have two lingering questions about the provenance of "social visibility" that the BIA might address on remand. Although the BIA can sufficiently explain and justify "social visibility" without answering these questions, any light the BIA can shed on these issues might help courts of appeals in the future and alleviate some of the remaining doubt about the reasonableness of these new requirements.

The most convincing justification for the "social visibility" requirement is that "if the alleged persecutor is not even aware of the [asylum applicant's] group's existence, it becomes harder to understand how the persecutor may have been motivated by the victim's 'membership' in the group to inflict the harm on the victim." *In re R-A-*, 22 I. & N. Dec. at 919. This helps explain why "social visibility" would be a factor in determining whether persecution is "on account of" membership in a group. It remains unclear, however, why "social visibility" should be used to define the group in the first place.

Another oft-used justification for "social visibility" is that it is derived from the United Nations High Commissioner for Refugees's (UNHCR) interpretation of the INA. *In re C-A-*, 23 I. & N. Dec. at 956, 960 (citing UNCHR, Guidelines on International Protection: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees, U.N. Doc. HCR/GIP/02/02 (May 7, 2002), ("UNHCR *Guidelines*")); *In re A-M-E-*, 24 I. & N. Dec. at 74

9

But the BIA's analysis comes undone when it states in conclusory fashion that all of the groups recognized as "particular social groups" in earlier cases would meet the "particularity" and "social visibility" requirements. *See In re C-A-*, 23 I. & N. Dec. at 960 (listing "young women of a particular tribe who were opposed to female genital mutilation," "persons listed by the government as having the status of a homosexual," "former members of the national police," and "former military leadership or land ownership" as "social groups [that] involved characteristics that were highly visible and recognizable by others in the country in question"). If this is true—that all of the groups that have been recognized under the *Acosta* standard would be recognized under the new approach—then the otherwise reasonable definitions and applications of "particularity" and "social visibility" become, at best, muddled, and, at worst, incoherent.

---

(same). The UNHCR *Guidelines*, however, treat "social visibility" as an alternative to *Acosta* as a way to establish a "particular social group"; it is not a requirement in addition to *Acosta*. *See In re C-A-*, 23 I. & N. Dec. at 956 ("The UNHCR *Guidelines* define a 'particular social group' as 'a group of persons who share a common characteristic other than their risk of being persecuted, *or* who are perceived as a group by society." (emphasis added) (quoting UNHCR *Guidelines* at ¶ 11)). Why, then, has the BIA decided to turn the *Guidelines*' disjunctive into a conjunctive, essentially creating an "*Acosta*-plus" test, rather than adopt the "*Acosta*-or" test endorsed by the UNHCR?

The BIA has said that "[t]he essence of the 'particularity' requirement . . . is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." *Matter of S-E-G-*, 24 I. & N. Dec. at 584. This allows the BIA to weed out groups that are "too subjective, inchoate, and variable." *In re A-M-E-*, 24 I. & N. Dec. at 76. In rejecting Galdamez's proposed group based on a lack of particularity, though, the BIA described it as "'potentially large and diffuse.'" App. at 11 (quoting *Matter of S-E-G-*, 24 I. & N. Dec. at 585). This suggests that "particularity" also embodies some kind of numerical or geographical limitation. If there are no such limitations, then it is unclear why it matters how "large" or "diffuse" a proposed group is. If such limits do exist, then it is unclear how the BIA can be sure, without hearing any argument on the matter, that "young women of a particular tribe who were opposed to female genital mutilation," "persons listed by the government as having the status of a homosexual," "former members of the national police," and "former military leaders[] or land owners[]" are any less numerous or widespread than "Honduran youth who have been actively recruited by gangs but have refused to join because they oppose the gangs."

"Social visibility" has been defined as "the extent to which members of a society perceive those with the characteristic in question as members of a social group," *Matter of E-A-G-*, 24 I. & N. Dec. at 594, and requires that "the group . . . generally be recognizable by others in the community," *Matter of S-E-G-*, 24 I. & N. Dec. at 586. It is unclear whether this means that the group's shared characteristic must be visible to the naked eye (*i.e.*, pass the

11

"eyeball test") or just that the applicant's society must understand individuals with the shared characteristic (visible or invisible) to be members of a group. In *In re C-A-*, the BIA suggested that "social visibility" is an eyeball test when it rejected a proposed social group because its shared characteristic is one "that is generally out of the public view." *In re C-A-*, 23 I. & N. Dec. at 960. The BIA seemed to reaffirm this approach in *Matter of E-A-G-*, when it found that an applicant's proposed group lacked "social visibility" because he "d[id] not allege that he possesses any characteristics that would cause others in [his] society to recognize him" as a member. But if "social visibility" is, or somehow accounts for, an eyeball test, then it is unclear how "young women of a particular tribe who were opposed to female genital mutilation," "persons listed by the government as having the status of a homosexual," "former members of the national police," or "former military leaders[]" would qualify.

Announcing a new interpretation while at the same time reaffirming seemingly irreconcilable precedents suggests that the BIA does not recognize, or is not being forthright about, the nature of the change its new interpretation effectuates. It also unfairly forces asylum applicants to shoot at a moving target.[5] It is up to the BIA to bring some stability

---

[5] Although the BIA noted in *Acosta* that "[t]he particular kind of group characteristic that will qualify under th[e *Acosta*] construction remains to be determined on a case-by-case basis," 19 I. & N. Dec. at 233, I assume that the BIA was referring to case-by-case evaluation of individual applicants' proposed groups and whether they meet the established legal standard. If the BIA is permitted to engage

12

to its interpretation of the law by committing either to the *Acosta* line of cases or to the "particularity" and "social visibility" requirements, both of which are permissible and reasonable.

I agree with the Majority that the BIA "can[] add new requirements to, or even change, its definition of 'particular social group,'" Maj. Op. at 49, but I also note that the BIA's change can be the adoption of "particularity" and "social visibility." Were it not for the seemingly irreconcilable conflict with prior decisions that the BIA has not yet disavowed, I would see no "reasonableness" problem with the "particularity" and "social visibility" requirements. Thus, the BIA may, upon further review, decide to jettison *Acosta* and its progeny or open them up to reconsideration. Conversely, the BIA may decide that its precedent should remain intact, in which case, "particularity" and "social visibility" must be refined or eliminated.[6] It is not for us to make this choice

in case-by-case *ad hoc* revisions of the entire legal framework—without acknowledgement or explanation—then it would be free to arbitrarily pick and choose whatever statutorily-permissible construction of "particular social group" it finds agreeable at the moment.

[6] I acknowledge that there may also be some way for the BIA to reconcile its new interpretation and its precedent, and I do not mean to suggest that such a reconciliation automatically renders the BIA's explanation defective. My point is simply that more analysis is needed before I can conclude that the BIA has provided a reasoned explanation of how its new rules fit—or, it appears, do not fit—with the old ones.

13

between new requirements and precedent, nor is it our place to impose our own readings of the statute in an attempt to reconcile the two. Rather, the BIA should address these issues on remand, and we should defer to whatever conclusion it reaches—even if it is to reject precedent and move ahead with "particularity" and "social visibility" in their current forms—provided it explains itself in a way that exhibits expert consideration and logical, reasonable, permissible interpretations of the INA. *See N.L.R.B. v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 800 (1990) (Blackmun, J., dissenting) ("Confronted with a court's conclusion that two of its policy pronouncements are inconsistent, the agency may choose for itself which path to follow, or it may attempt to explain why no contradiction actually exists."); *Gatimi*, 578 F.3d 611, 616 (7th Cir. 2009) ("When an administrative agency's decisions are inconsistent, a court cannot pick one of the inconsistent lines and defer to that one, unless only one is within the scope of the agency's discretion to interpret the statutes it enforces or to make policy as Congress's delegate. Such picking and choosing would condone arbitrariness and usurp the agency's responsibilities." (citations omitted)).

II

I also write separately to take issue with the BIA's factfinding. We first remanded this case in 2007 "so the agency [could] address the issues that it did not reach . . . [including] whether the group identified by Galdamez is a 'particular social group' within the meaning of the Act." *Valdiviezo-Galdamez v. Att'y Gen. of the U.S.*, 502 F.3d 285, 291 (3d Cir. 2007) (*Valdiviezo-Galdamez I*). We did not authorize the BIA to usurp the IJ's role as factfinder.

14

According to 8 C.F.R. § 1003.1(d)(3)(iv), "[e]xcept for taking administrative notice of commonly known facts such as current events or the contents of official documents, the [BIA] will not engage in factfinding in the course of deciding appeals." *See also Negusie*, 129 S. Ct. at 1168 ("If the BIA decides to adopt a standard that [differs from the existing standard], it may be prudent *and necessary* for the Immigration Judge to conduct additional factfinding based on the new standard." (emphasis added)); *Padmore v. Holder*, 609 F.3d 62, 67 (2d Cir. 2010) ("[W]hen the BIA engages in factfinding in contravention of 8 C.F.R. § 1003.1(d)(3)(iv), it commits an error of law, which we have jurisdiction to correct."); *Hashmi v. Att'y Gen. of the U.S.*, 531 F.3d 256, 262 (3d Cir. 2008) ("[T]o the extent that the BIA's decision rests in the alternative on its own finding of fact . . ., it erred." (footnote omitted)).

As of June 2005, when the IJ first heard Galdamez's case, the only BIA decision discussing "social visibility" was *In re R-A-*, and that opinion had been vacated in early 2001. *In re C-A-*, with its enhanced definition of "particularity" and application of the "social visibility" requirement, was not published as precedential until June 15, 2006, exactly one year after the IJ rejected Galdamez's petition. Thus, Galdamez had no reason to present evidence or argue facts relating to, for instance, whether "he possesses any characteristics that would cause others in Honduran society to recognize him as one who has refused gang recruitment" or whether his proposed group is too "large and diffuse" to be considered "particular." Nor did the IJ have any reason to make factual findings on these points.

On remand from our 2007 decision, the BIA papered over the lack of factual development by relying on factual

15

findings made in *Matter of S-E-G-* and *Matter of E-A-G-*, both of which also post-dated Galdamez's hearing before the IJ. The only "evidence" to which the BIA cited for its "particularity" and "social visibility" findings were quotations from those cases, coupled with conclusory statements that the same facts apply to Galdamez's case. For instance, the BIA quoted *Matter of E-A-G-* at length for propositions such as: "[T]here is no showing that membership in a larger body of persons resistant to gangs is of concern to anyone in Honduras, including the gangs themselves." *Id.* (quoting *Matter of E-A-G-*, 24 I. & N. Dec. at 594–95). I pass no judgment on the truth of this statement or its application in *Matter of E-A-G-*, but I do not accept its blanket application to Galdamez's case, where the evidentiary record was not developed with any notion of "particularity" or "social visibility" requirements. It remains to be seen whether Galdamez might be able to produce testimony, affidavits, or some other evidence not presented by the applicants in *Matter of S-E-G-* or *Matter of E-A-G-*.

Under 8 C.F.R. § 1003.1(d)(3)(iv), the IJ is the factfinder. Here, the BIA implicitly determined that Galdamez is identically situated to the asylum applicants in *Matter of S-E-G-* and *Matter of E-A-G-*, and that he would be unable to show "particularity" and "social visibility" because those two earlier applicants were unable to do so. That may be true, but that decision is for the IJ in the first instance. If, on remand, the BIA does change course and adopts new rules for asylum applicants, it must also remand Galdamez's case to the IJ for additional factfinding. Galdamez's appeal before the BIA should not be limited by an evidentiary record compiled under an outdated law, or by the facts and arguments raised by other applicants in cases other than his

16

own. He should have the opportunity to present evidence with an eye towards the law under which his case is being decided.

## III

In sum, I agree with the Majority that a remand is in order. The BIA now has a choice of either remaining faithful to its precedents or adopting new requirements that would likely produce different outcomes for future applicants claiming to be members of the same "particular social groups" as were recognized in earlier Board decisions. If it chooses the latter course, I would also instruct the BIA to remand the matter to the IJ so Galdamez can have a full and fair opportunity to be heard under the new legal standards.