Chief Judge KOZINSKI,
with whom Judge BYBEE joins,
dissenting:
In summarily reversing us just six years ago, the Supreme Court held that it’s the BIA, not we, who must decide whether a petitioner is a member of a particular social group for purposes of asylum. Gonzales v. Thomas, 547 U.S. 183, 126 S.Ct. 1613, 164 L.Ed.2d 358 (2006) (per curiam). The Court quoted approvingly the Solicitor General’s cert petition for the proposition that “a court’s role in an immigration case is typically one of ‘review, not of first view.’ ” Id. at 185, 126 S.Ct. 1613 (internal *1095 quotation marks omitted). The majority today forgets this admonition and engages in a good deal of first viewing, in clear contravention of Thomas and INS v. Orlando Ventura, 537 U.S. 12, 16-17, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002). Along the way, it deepens a circuit conflict on an issue where national uniformity is vital, and sows uncertainty into our circuit law where previously there was clarity. The far wiser course would be for us to vacate the order taking the case eri banc as improvidently granted and reinstate the three-judge panel’s disposition.
1. Congress has given the Attorney General discretion to grant asylum to certain limited classes of aliens- — those who have a well-founded fear of persecution in their home countries “on account of race, religion, nationality, membership in a particular social group, or political opinion.” 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A). Of these, persecution on account of membership in a particular social group is by far the most amorphous. See Maj. op. at 1083; Stanley D. Radtke, Defining a Core Zone of Protection in Asylum Law, 10 J.L. & Soc. Challenges 22, 29 (2008). Race, nationality, religious affiliation and political opinion can usually be determined by objective evidence, but what constitutes a social group requires a judgment about shared norms and perceptions in the society where the individual is living.
The asylum statute uses the term “particular social group” but gives no clue as to what it means. There are no committee reports, hearing transcripts or floor statements that shed light on that obscure phrase. See Maryellen Fullerton, A Comparative Look at Refugee Status Based on Persecution Due to Membership in a Particular Social Group, 26 Cornell Int’l L.J. 505, 513-14 (1993). What we do know is that the language came from the 1951 United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137, by way of the 1967 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267, which the United States ratified in 1968. See Sanchez-Trujillo v. INS, 801 F.2d 1571, 1575 (9th Cir.1986). Congress intended that the Act’s refugee definition “be interpreted in conformance with the [1967] Protocol’s definition.” See INS v. Cardoza-Fonseca, 480 U.S. 421, 436-37, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). But, the term “social group” was added to the Convention last minute and without discussion, so there is little extrinsic evidence as to what it means. Radtke, supra, at 32. Advice from the United Nations has come only ex-post. See, e.g., U.N. High Comm’r for Refugees, Guidelines on International Protection: “Membership of a particular social group” unth-in the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees, U.N. Doc. HCR/GIP/02/02 (May 7, 2002).
Because of this indeterminacy in the drafting process, the United States, along with other developed countries, has had to struggle to give meaning to a term that has little pedigree of its own. The process has, of necessity, involved case-by-ease adjudication and called for periodic adjustment as our understanding of the term has evolved in light of experience.
What agglomeration of people a society recognizes as a group is seldom written down and must typically be deduced from inconclusive evidence as to how individuals sharing common characteristics are viewed by those around them. Take as an example a society we know something about — the United States. I’d guess most people consider the following to be identifiable social groups: Vietnam veterans, male homosexuals, college students, lawyers, Masons, cancer survivors, blind people, Cajuns, practitioners of Falun Gong and hippies. And the following groups of *1096 people who have something in common would, nevertheless, probably not be viewed as social groups: left-handed people, high school dropouts, blondes, crime victims, disabled people, dog owners, second-born children and haters of broccoli.
This leads to several observations: First, it’s debatable whether some of the proposed groups should be on the first or second list. Crime victims may be too broad to define a social group, but what about victims of rape or domestic violence, or families of persons who were killed or maimed by drunk drivers? Second, the appropriate granularity of any group definition is subject to debate. Are Vietnam veterans a group on their own or are they merely part of the larger group of combat veterans? Do male homosexuals make up a separate social group or are they part of a larger social group that includes female homosexuals and transgendered persons? Third, many — perhaps most — people in some social groups may not identify themselves as part of any such group. Masons choose to be Masons, but not all homosexuals identify themselves by their sexual orientation, and some may wish to conceal their sexual identity. Nevertheless, if society sees homosexuals as a distinct social group, individuals with that sexual orientation will be treated as involuntary members, if and when their sexual orientation is discovered.
As these examples illustrate, determining whether someone is a member of a social group, even within our own society, is no mean task. The matter is further complicated when the question is whether another society, with a culture and language different from our own, considers some subset of its population to be a social group. The question is quite important, however, because any number of people sharing a characteristic could be considered a social group. The group may be as small as two and as large as a majority of the population, paving the way for huge numbers of people to obtain political asylum. Yet, Congress surely didn’t mean to open the immigration floodgates to everyone in the world who is oppressed. Indeed, the Guidelines to the U.N. Protocol state quite clearly that “the social group category was not meant to be a ‘catch all’ applicable to all persons fearing persecution.” In re C-A-, 23 I. & N. Dec. 951, 960 (BIA 2006) (quoting U.N. High Comm’r for Refugees, Guidelines on International Protection, supra).
The United States received 74,000 asylum applications last year, half again as many as any other industrialized nation. See U.N. High Comm’r for Refugees, Asylum Levels and Trends in Industrialized Countries 3 (2011), available at http:// www.unhcr.org/4e9beaal9.html. Confronted with the difficult and sensitive task of determining whether individuals seeking asylum are persecuted on the basis of membership in a large variety of proposed social groups,[1] the BIA has announced and *1097 refined the standard for dealing with such issues. In In re Acosta, 19 I. & N. Dec. 211 (BIA 1985), the BIA took a first pass at the issue by holding that persecution on account of membership in a particular social group means “persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic.... [This characteristic] must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.” Id. at 233. Acosta made it clear that “[t]he particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis.” Id. The BIA’s decisions on this issue are entitled to Chevron deference, and more. See INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999).
Over the years, the BIA has worked diligently and thoughtfully to refine the definition of membership in a social group. Along the way, it’s announced a series of criteria and limitations, all designed to give the term “social group” a concrete and consistent meaning that doesn’t give a free pass into the United States to anyone and everyone who is persecuted in his home country. These criteria include the following:
• A past experience is an immutable characteristic because “it has already occurred and cannot be undone.” C-A-, 23 I. & N. Dec. at 958. But not every kind of “past experience that may be shared by others suffices to define a particular social group for asylum purposes.” Id.; In re S-E-G-, 24 I. & N. Dec. 579, 584 (BIA 2008).
• The characteristic common to the proposed group must be such that the society in which it’s situated recognizes individuals having that characteristic as constituting a distinct social group. See C-A-, 23 I. & N. Dec. at 959-60; S-EG-, 24 I. & N. Dec. at 586. The BIA sometimes refers to this as the “social visibility” requirement. See C-A-, 23 I. & N. Dec. at 959.
• “[A] social group cannot be defined exclusively by the fact that its members have been subjected to harm, ... [but] this may be a relevant factor in considering the group’s visibility in society.” AM-E, 24 I. & N. Dec. at 74.
• It isn’t necessary to show a “voluntary associational relationship among the group members ... [nor] an element of cohesiveness or homogeneity among group members.” C-A-, 23 I. & N. Dec. at 956-57 (internal quotation marks omitted).
• “Whether a proposed group has a shared characteristic with the requisite ‘social visibility’ must be considered in the context of the country of concern and the persecution feared.” A-M-E, 24 I. & N. Dec. at 74. The BIA has “considered as a relevant factor the extent to which members of a society perceive those with the characteristic in question as members of a social group.” C-A-, 23 I. & N. Dec. at 957.
• The risk faced by the group in question must be specific to the group and not one shared by society at large, see A-M-E, 24 I. & N. Dec. at 75, or by anyone who stands in the way of the persecutors. See C-A-, 23 I. & N. Dec. at 960-61; SE-G-, 24 I. & N. Dec. at 587 (“However, such gangs have directed harm against anyone and everyone perceived to have *1098 interfered with, or who might present a threat to, their criminal enterprises and territorial power. The respondents are therefore not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang’s interests.”).
• “Membership in a purported social group requires that the group have particular and well-defined boundaries.... ” S-E-G-, 24 I. & N. Dec. at 582. “The essence of th[is] ‘particularity’ requirement ... is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons.” Id. at 584.
• The persecution that petitioners seek to escape must be motivated by their membership in the group in question and not by factors that are “quite apart” from such membership. Id. at 585. The BIA explains the difference by giving this example:
Were a situation to develop in which former police officers were targeted for persecution because of the fact of having served as police officers, a former police officer could conceivably demonstrate persecution based upon membership in a particular social group of former police officers. On the other hand, if a former police officer were singled out for reprisal, not because of his status as a former police officer, but because of his role in disrupting particular criminal activity, he would not be considered, without more, to have been targeted as a member of a particular social group.
C-A- 23 I. & N. Dec. at 958-59.
These requirements can be summarized as follows: In order to establish eligibility for asylum based on persecution for membership in a social group, a petitioner must show that he’s part of a group that’s well-defined by a characteristic other than the fact that its members have been subjected to harm; is recognized within the society as a distinct group; is described with sufficient particularity so that it’s possible to determine with reasonable certainty who’s included in the group; and whose members are targeted for persecution because of their membership in the group, not on account of some other, perhaps closely associated, trait.
2. We approved the BIA’s approach in Ramos-Lopez v. Holder, 563 F.3d 855 (9th Cir.2009). Petitioner in that case was a Honduran national who had refused recruitment by the Mara Salvatrucha gang, or MS-13, which subsequently threatened to kill him. See id. at 856. He came to the United States and claimed asylum on account of persecution on the basis of membership in a particular social group, namely young Honduran men who have been recruited by MS-13, but who refuse to join. Id. The BIA, relying on S-E-G-, determined that there was no such particular social group. Id. at 859-62.
Judge Tashima’s well-reasoned opinion in Ramos-Lopez (unlike the majority today) starts with the framework set out by the Supreme Court in Thomas: “ ‘The matter requires determining the facts and deciding whether the facts as found fall within a statutory term.’ ” Id. at 859 (quoting Thomas, 547 U.S. at 186, 126 S.Ct. 1613). Ramos-Lopez also gives due deference to our en banc opinion in Marmolejo-Campos v. Holder, 558 F.3d 903 (9th Cir.2009) (en banc), (as the majority here does not) and concludes that the BIA’s construction of particular social group is entitled to Chevron deference. Ramos-Lopez, 563 F.3d at 858-60 & n. 4. Deferring to the BIA, we noted that prior gang recruitment was a past experience that couldn’t be changed, but that such “ ‘shared past experience [does not neces *1099 sarily] suffice[] to define a particular social group for asylum purposes.’ ” Id. at 860 (quoting S-E-G-, 24 I. & N. Dec. at 584) (alterations in original). Hewing closely to the BIA’s reasoning, we noted that “ ‘gang violence and crime in El Salvador [and Honduras] appear to be widespread, and the risk of harm is not limited to young males who have resisted recruitment ... but affects all segments of the population.’ ” Id. at 860-61 (quoting S-EG-, 24 I. & N. Dec. at 587). Significantly, we relied on the BIA’s observation “that those who have resisted recruitment are ‘not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang’s interests.’” Id. (quoting S-E-G-, 24 I. & N. Dec. at 587).
Most other circuits have deferred to the BIA’s interpretation of particular social group. See Orellana-Monson v. Holder, 685 F.3d 511, 521 (5th Cir.2012); Gaitan v. Holder, 671 F.3d 678, 680-82 (8th Cir.2012); Rivera-Barrientos v. Holder, 666 F.3d 641, 647-53 (10th Cir.2012); Lizama v. Holder, 629 F.3d 440, 444-48 (4th Cir.2011); Scatambuli v. Holder, 558 F.3d 53, 59-60 (1st Cir.2009); Ucelo-Gomez v. Mukasey, 509 F.3d 70, 73-74 (2d Cir.2007); Castillo-Arias v. U.S. Attorney Gen., 446 F.3d 1190, 1197 (11th Cir.2006); Castella-no-Chacon v. INS, 341 F.3d 533, 546 (6th Cir.2003).
Two circuits have taken a contrary view. In an opinion that pays lip service to Thomas but, in fact, usurps the role of the BIA, the Seventh Circuit rejected the Board’s social visibility requirement. Gatimi v. Holder, 578 F.3d 611, 615-16 (7th Cir.2009). The court’s reasons for doing so are obscure but, best I can tell, the Seventh Circuit confused social visibility with on-sight visibility, and criticized the BIA for requiring that social groups be identifiable on sight:
Women who have not yet undergone female genital mutilation in tribes that practice it do not look different from anyone else. A homosexual in a homophobic society will pass as heterosexual. If you are a member of a group that has been targeted for assassination or torture or some other mode of persecution, you will take pains to avoid being socially visible; and to the extent that the members of the target group are successful in remaining invisible, they will not be “seen” by other people in the society “as a segment of the population.”
Id. at 615.
This criticism is unfounded. As even the majority here recognizes, the BIA’s social visibility requirement doesn’t mean that the characteristics defining the group must be recognizable on sight. Maj. op. at 1087-89. The BIA has made it perfectly clear that the social visibility test is designed to determine whether the proposed group of which petitioner claims to be a member is perceived as a group by the society in question, not whether individual members of the group can be identified on sight. See C-A-, 23 I. & N. Dec. at 959-61. That’s why it’s called social visibility rather than just visibility.
The Seventh Circuit also criticized the BIA for inconsistency with certain cases it had decided some two decades earlier. Gatimi, 578 F.3d at 615-16. It blamed the BIA for forging a new direction “without repudiating the other line of cases.” Id. at 616. But, assuming the other cases were inconsistent with the more recent ones— and I’m not convinced they were — an agency is not bound to retain the same interpretation in perpetuity; it may — indeed it should — adapt its approach in light of experience. See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 514-15, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009); Nat’l *1100 Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). Nor is the agency required to recite an incantation when it modifies an existing approach or adopts a new one. It’s enough that the agency announces a new policy, gives reasons for it and thereafter applies it consistently. See Fox Television, 556 U.S. at 514-15, 129 S.Ct. 1800; Brand X, 545 U.S. at 981, 125 S.Ct. 2688. It’s when the agency treats some parties before it one way while treating others, similarly situated, differently that the problem of arbitrary enforcement arises. The Seventh Circuit pointed to no such arbitrary enforcement on the part of the BIA, so it’s hard to understand what the Seventh Circuit was so grumpy about.
In Valdiviezo-Galdamez v. Attorney General of the United States, 663 F.3d 582 (3d Cir.2011), a divided panel struck down the social visibility requirement, largely channelling the Seventh Circuit’s opinion in Gatimi Id. at 603-07. Doing the Seventh Circuit one better, the Third Circuit also struck down the BIA’s particularity requirement. Id. at 608. According to the Third Circuit majority, “the BIA’s addition of the requirements of ‘social visibility’ and ‘particularity’ to its definition of ‘particular social group’ is inconsistent with its prior decisions, and the BIA has not announced a ‘principled reason’ for its adoption of those inconsistent requirements.” Id. Judge Hardiman wrote separately, recognizing the reasonableness of the social visibility and particularity requirements and opining that the BIA was entitled to adopt both on remand. Id. at 612, 615 (Hardiman, J., concurring).
The Tenth Circuit considered the criticisms leveled at the BIA by the Seventh Circuit and roundly rejected them in a lucid opinion by Judge Tymkovich. Rivera-Barrientos, 666 F.3d 641. The Tenth Circuit noted that
the particularity requirement flows quite naturally from the language of the statute, which, of course, specifically refers to membership in a ‘particular social group.’ [8 U.S.C.] § 1101(a)(42)(A) (emphasis added).... And as a matter of logic, it is reasonable to read the statute as limiting its recognition of ‘social groups’ to those that can be defined with some specificity — to encourage amorphous definitions would likely yield inconsistent, arbitrary, and over broad results.
Id. at 649; see also id. at 651-52 (expressly disagreeing with the Seventh Circuit’s suggestion that social visibility requires that “the relevant trait be visually or otherwise easily identified” and giving examples from past BIA decisions). Bravo to the Tenth!
3. Our circuit has given proper deference to the BIA’s social visibility and particularity requirement in Ramos-Lopez and numerous other cases. See, e.g., Donchev v. Mukasey, 553 F.3d 1206, 1216-17 (9th Cir.2009); Soriano v. Holder, 569 F.3d 1162, 1165-66 (9th Cir.2009); Santos-Lemus v. Mukasey, 542 F.3d 738, 744-46 (9th Cir.2008). The present case involves a straightforward application of the principles announced in those cases and so could have been decided in an unpublished disposition — as, in fact, it was. Henriquez-Rivas v. Holder, 449 Fed.Appx. 626 (9th Cir.2011). And there it might have remained, but for a concurrence by the author of the current majority opinion, joined by a visiting judge who happened to be a member of the panel that issued the misbegotten Seventh Circuit Gatimi opinion. The concurrence quotes Gatimi approvingly, echoes the charges of inconsistency and irrationality leveled by the Third and Seventh Circuits, and calls for en banc reevaluation of our circuit law concerning political asylum based on membership in a *1101 particular social group. Id. at 628-33. Not surprisingly, the full court obliged, so here we are.
This brings us to today’s opinion, which starts off well enough but then quickly and deeply falls into error. The majority first tackles the question of whether the social visibility requirement calls for ocular recognition or perception by society. Maj. op. at 1087-89. The opinion goes on for much longer than necessary but eventually reaches the obvious — and right — conclusion that social visibility refers to social perceptions, not to on-sight recognition. Id. Thankfully, my colleagues avoid the pitfall of Gatim% which they quote prominently, id. at 1087, but eventually forsake.[2]
The panel then goes on to make some serious mistakes of its own. The first of these concerns who must perceive the petitioner as belonging to a particular social group. Maj. op. at 1089. Using circular reasoning, the opinion concludes that “the perception of the persecutors may matter the most.” Maj. op. at 1089. That’s three mistakes right there. See generally Cone, op. (McKeown, J.). First, it’s not our call; it’s the BIA’s. See id. If there’s any doubt whether the BIA has decided the issue, the most we can do is point out the problem and remand for the BIA to resolve the question in the first instance. See Ventura, 537 U.S. at 16, 123 S.Ct. 353; Montes-Lopez v. Gonzales, 486 F.3d 1163, 1165 (9th Cir.2007). Only after it does, can we decide whether that construction is reasonable; never do we get to decide such a question of interpretation in the first instance. By casting its conclusion as mere “observation” or “suggestion],” the majority attempts an end run around Ven-tura. Maj. op. at 1089, 1090. But observations and suggestions that go on for more than six hundred words and three footnotes amount to much more than random thoughts. The message to the BIA is clear: We have decided; please do us all the favor of falling in line now.
Second, the BIA has decided the question: “[W]e referred to the 2002 guidelines of the United Nations High Commissioner for Refugees, which endorse an approach in which an important factor is whether the members of the group are perceived as a group by society.” A-M-E, 24 I. & N. Dec. at 74 (internal quotation marks omitted) (emphasis added); see also Cone. op. (McKeown, J.). The majority’s determination that it’s the perception of the persecutor that matters is contrary to the approach of the BIA. This we may not do without first finding that the BIA’s interpretation is incompatible with the language of the statute, which of course it’s not. *1102 Third, and worst of all, the majority’s conclusion that it’s the perception of the persecutor that matters is at loggerheads with the BIA’s repeated admonition that “a social group cannot be defined exclusively by the fact that its members have been subjected to harm.” A-M-E, 24 I. & N. Dec. at 74 (relying on the Guidelines of the U.N. High Commissioner for Refugees); see also Cone. op. (McKeown, J.). Defining a social group in terms of the perception of the persecutor risks finding that a group exists consisting of a persecutor’s enemies list. The BIA’s approach is to determine whether petitioner has met his burden of showing that the society in question recognizes him as a member of a social group, and then to ask whether he is persecuted on account of his membership in that group. We are bound to follow the methodology adopted by the agency, not invent our own.
But it gets worse. The majority vacates the BIA’s determination that Henriquez-Rivas failed to show that she was subjected to persecution on account of her membership in the group of people testifying against gang members because the proposed group lacks social visibility: “[P]eo-ple testifying against gang members is merely a shared experience and not a particular social group within the meaning of the Act.” Henriquez-Rivas, No. A098 660 718, at 1 (BIA May 1, 2009). The BIA also held that “defining the group as persons opposing gang members is too amorphous.” Id.
My colleagues vacate the BIA’s social visibility determination on the ground that it is, in their view, inconsistent with the BIA’s “own precedent as stated in C-A- and its progeny.” Maj. op. at 1091. According to the majority, “[t]his case clearly falls within the language in C-A- holding that those who testify against cartel members are socially visible: ‘[Vjisibility is limited to those informants who are discovered because they appear as witnesses or otherwise come to the attention of cartel members.’ ” Id. at 1092 (quoting C-A- 23 I. & N. Dec. at 960) (emphasis omitted). The lone phrase from C-A-, which is the fulcrum of the majority’s reasoning, simply will not bear the weight.
To begin with, the sentence describes a necessary condition for social visibility, but the BIA nowhere says it’s sufficient. CA- was one of the earliest cases where the BIA elucidated the social visibility requirement by considering the proposed group of non-criminal informants. In finding that the proposed group isn’t socially visible, the Board disposed of the case on the ground that the members of the group weren’t identifiable at all, and thus couldn’t be the targets of persecution. See C-A- 23 I. & N. Dec. at 960-61.
But that’s not all the BIA said in C-A-. On the same page where it used the language on which my colleagues rely, the BIA set forth a further ground for rejecting the asylum application:
The record in this case indicates that the Cali cartel and other drug cartels have directed harm against anyone and everyone perceived to have interfered with, or who might present a threat to, their criminal enterprises. In this sense, informants are not in a substantially different situation from anyone who has crossed the Cali cartel or who is perceived to be a threat to the cartel’s interests.
C-A-, 23 I. & N. Dec. at 960-61 (internal quotation marks omitted); see also Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir.1993). This rationale speaks directly to whether a petitioner is the subject of persecution on account of his group membership. If someone is persecuted on grounds that are closely associated with group membership but also apply to many others in society, then the persecution is not on account of *1103 membership in a particular social group. The BIA has made it clear in subsequent cases that this is a limitation on social visibility. See, e.g., A-M-E, 24 I. & N. Dec. at 75.
When reviewing agency decisions for consistency, we aren’t allowed to cherry-pick stray sentences from the agency’s past opinions and ignore others. Nor may we insist that the agency stand by its rulings in perpetuity. An agency charged with administering an ambiguous statute is entitled to change its mind. See Fox Television, 556 U.S. at 514-15, 129 S.Ct. 1800.
Assuming that the BIA was at some point in the past bound by the stray sentence on which the majority relies, the agency has long since modified that position. In S-E-G-, for example, the BIA dealt with a proposed social group consisting of youths who resisted gang recruitment efforts. 24 I. & N. Dec. at 582. The gangs obviously knew who refused their recruitment efforts, and the fear of retaliation arose because of that knowledge. In that regard, the petitioners in S-E-G-were in precisely the same position as individuals who testified openly against gangs (like petitioner here). Yet the Board held that this wasn’t sufficient to meet the social visibility requirement: “[Yjouth who have been targeted for recruitment by, and resisted, criminal gangs may have a shared past experience, which, by definition, cannot be changed. However, this does not necessarily mean that the shared past experience suffices to define a particular social group for asylum purposes.” Id. at 584.[3]
4. Having found fault with the BIA’s determination that petitioner’s proposed group lacks social visibility, the majority goes on to make findings of its own. This is wrong. We’ve been told time and again that we aren’t fact-finders; we’re reviewers. See Ventura, 587 U.S. at 16, 123 S.Ct. 353. And, when it comes to the difficult, sensitive and fact-intensive question as to whether petitioner is a member of a particular social group, “[t]he matter requires determining the facts and deciding whether the facts as found fall within a statutory term.” Thomas, 547 U.S. at 186, 126 S.Ct. 1613. The proper course in such circumstances is to apply the “ordinary ‘remand’ rule,” and refer the matter back to the agency in light of whatever views of the law we may express in our opinion. Id. at 187, 126 S.Ct. 1613. Yet my colleagues defy the Supreme Court on a point where we’ve been summarily reversed twice before. Id. (citing Ventura, 537 U.S. 12, 123 S.Ct. 353). Pretty gutsy.
Jumping head first into the fact-finding process, the majority makes a mess of it. According to the opinion, the BIA here
failed to consider significant evidence that Salvadoran society recognizes the unique vulnerability of people who testify against gang members in criminal proceedings, because gang members are likely to target these in *1104 dividuals as a group. Notably, as Henriquez-Rivas cited in her briefing before the BIA as well as in her opening brief on petition for review, the Salvadoran legislature enacted a special witness protection law in 2006 to protect people who testify against violent criminal elements, such as MS, in Salvadoran court. It is difficult to imagine better evidence that a society recognizes a particular class of individuals as uniquely vulnerable, because of their group perception by gang members, than that a special witness protection law has been tailored to its characteristics.
Maj. op. at 1092 (emphasis added) (internal citations omitted). But the BIA did explicitly consider and reject precisely this purported evidence: “We are unpersuaded by the respondent’s apparent attempt to equate El Salvador’s enactment of a witness protection law in that country to the definition of refugee under United States immigration law.” Henriquez-Rivas, No. A098 660 718, at 1-2.
Furthermore a class of individuals can be identified as uniquely vulnerable and given legal protection, yet not constitute a social group. We have laws recognizing the unique vulnerability of children, see, e.g., Child Abuse Prevention and Treatment Act, 42 U.S.C. § 5101 et seq., yet we don’t consider all children to constitute a particular social group. We have laws protecting individuals who are disabled— physically and mentally- — see, e.g., Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., yet we wouldn’t say that blind people, people in wheelchairs, those who are hearing-impaired and those who have Down syndrome or autism all make up a social group. We have laws giving special protection to victims of crime, such as the Victim and Witness Protection Act of 1982, Pub.L. No. 97-291, 96 Stat. 1248 (1982), but all victims of crime don’t make up a big social group. The list is endless.
This isn’t to say that legal protection never coincides with group status; the legislature may well pass laws that protect what’s otherwise recognized as a social group, such as veterans or school teachers. But whether this is the case is a question of fact. And, as my colleagues seem to have forgotten, we aren’t fact-finders. When the majority says “[i]t is difficult to imagine better evidence [of social visibility],” maj. op. at 1092 (emphasis added), it’s pretty much conceding that that’s what it’s doing — and doing it in direct contravention of the BIA’s own finding on the same issue. The only way we could vacate the BIA’s decision on this point is if we concluded that it’s “illogical, implausible, or without support in inferences that may be drawn from facts in the record.” Cf. United States v. Hinkson, 585 F.3d 1247, 1251 (9th Cir.2009) (en banc).
Can we honestly say that there is no support in the record for the BIA’s finding? Hardly. As the BIA has pointed out, violence against anyone and everyone who interferes with gangs is endemic in El Salvador. Those who testify against gang members, those who resist their recruitment, those who inform against them to the government, those who cross them in any way — they all get on the gangs’ enemies list and become the targets of violence, as do many others in society at large. That the government chooses to single out some targets of violence for special protection doesn’t imply that the society at large or the gangs themselves view them as a particular social group. The government may well have reasons independent of any group status for giving these individuals special protection. The reason here is obvious: The Salvadoran government has a strong interest in protecting the integrity of its criminal justice system by giving witnesses in criminal cases special protection. This is true in the United States as well: We have vari *1105 ous statutes that make it a criminal offense to intimidate or otherwise interfere with witnesses; we also have a witness protection program. But this doesn’t mean that we consider witnesses in criminal cases or even those who are in the witness protection program to be members of a particular social group. The question is, at the very least, debatable and my colleagues are wrong to try to make the finding themselves. We are, as the Supreme Court has told us, reviewers, not first viewers.
While the majority may believe its ruling is narrow, the implications are actually vast. As pointed out earlier, witnesses against gang members are not in a materially different position from others who act in opposition to gangs. C-A-, 23 I. & N. Dec. at 960-61. The BIA has consistently adhered to this rationale, rejecting asylum applications in numerous cases. See, e.g., S-E-G-, 24 I. & N. Dec. at 586-87; A-M-E, 24 I. & N. Dec. at 74-75. Today’s ruling casts doubt on this entire body of caselaw and puts the BIA in the untenable position of applying materially different law to asylum applicants who claim to be victims of gang violence depending on whether their cases will be appealed to our circuit or to one of the circuits that have approved the BIA’s approach, such as the First, Second, Fourth, Fifth, Sixth, Eighth, Tenth and Eleventh. Today’s opinion will thus force precisely the kind of inconsistency and arbitrariness in the agency’s rulings that the majority now purports to correct.
This case should never have been taken en banc. The three-judge panel’s unpublished disposition says all that need be said in this case. We should’ve left well enough alone.

. At various times, the BIA has dealt with claims of persecution on the basis of the following claimed social groups: persons resistant to gang membership, see In re E-A-G-, 24 I. & N. Dec. 591 (BIA 2008), women opposed to arranged marriage, see In Re A-T-, 24 I. & N. Dec. 296 (BIA 2007), wealthy Guatemalans, see In re A-M-E & J-G-U-, 24 I. & N. Dec. 69 (BIA 2007), women intimately involved with men who believe in male domination, see In re R-A-, 22 I. & N. Dec. 906 (BIA 2001), tribe members, see In re Y-B-, 21 I. & N. Dec. 1136 (BIA 1998), Filipinos of mixed Filipino-Chinese ancestry, see In re V-T-S-, 21 I. & N. Dec. 792 (BIA 1997), former members of the Guatemalan military, see In re C-A-L-, 21 I. & N. Dec. 754 (BIA 1997), women fearing genital mutilation, see In re Kasinga, 21 I. & N. Dec. 357 (BIA 1996), Marehan subclan members in Somalia, see In re H-, 21 I. & N. Dec. 337 (BIA 1996), Haitians deported from the United States, see In re Y-G-, 20 I. & N. Dec. 794 (BIA 1994), homosexual men, see In re Toboso-Alfonso, 20 *1097 I. & N. Dec. 819 (BIA 1990), Chinese persons opposed to the one-child policy, In re Chang, 20 I. & N. Dec. 38 (BIA 1989), and taxi drivers, see In re Acosta, 19 I. & N. Dec. 211 (BIA 1985).

. Though it eschews Gatimi’s conclusion, the majority does cast doubt on our cases holding that the social visibility and particularity requirements are entitled to Chevron deference. After speaking approvingly about the Seventh and Third Circuit opinions, the majority drops a heavy hint that we may soon follow suit: "Thus, we need not decide, in this case, at this time, whether the 'social visibility’ and ‘particularity’ criteria merit Chevron deference.” Maj. op. at 1091. But we have decided that these requirements are entitled to Chevron deference. See Barrios v. Holder, 581 F.3d 849, 855 (9th Cir.2009); Ramos-Lopez, 563 F.3d at 858-59; Arteaga v. Mukasey, 511 F.3d 940, 944-45 (9th Cir.2007).
An en banc court can do many things, but it can't simply declare a question unsettled. If my colleagues wish to reconsider Ramos-Lopez, they’re free to do so. But they have no authority to declare the issue open when our circuit law has decided it. The majority’s provocative suggestion that we may, in a future case, decide to deny Chevron deference to the BIA’s social visibility and particularity requirements will cause trouble down the road, as lawyers and judges puzzle about whether today's ruling was meant to clear the way for bringing Ninth Circuit law into line with that of the Seventh and Third Circuits. It has not because it cannot.

. The majority also errs in reversing the BIA’s ruling as to particularity. Maj. op at 1093-94. The BIA held that "defining the group as persons opposing gang members is too amorphous.” Henriquez-Rivas, No. A098 660 718, at 1. The majority criticizes the BIA for misstating Henriquez-Rivas’s position: "This was an incorrect statement of Henriquez-Ri-vas’ proposed social group, which referred to those who had testified against M-18 gang members in open court.” Maj. op. at 1093. But the BIA was reviewing the immigration judge, who had found that Henriquez-Rivas was a member of a group consisting of “people testifying against or otherwise [opposing] gang members.” Henriquez-Rivas, No. A098 660 718, at 1 (quoting Oral Decision of the Immigration Judge at 1, In re Henriquez-Ri-vas, No. A 098 660 718 (May 7, 2007)). The BIA couldn’t just ignore that disjunctive finding. It properly held that the group, as found by the immigration judge, lacked particularity-